ORANGEBURG MANUFACTURING CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 39249. Filed November 21, 1961.

*Richard P. Jackson, Esq.*, and *John V. Emerson, Esq.*, for the petitioner.

*Arthur N. Mindling, Esq.*, for the respondent.

HARRON, *Judge:* The Commissioner denied applications for relief under section 722, 1939 Code, pertaining to the years 1940, 1941, and 1942, and claims for refund of all of the excess profits taxes finally determined by the respondent to be due.

### FINDINGS OF FACT.

The parties entered into a stipulation of various facts and incorporated in the stipulation several joint exhibits. The stipulated facts are hereby adopted as part of our findings and are incorporated herein by reference together with the joint exhibits.

The petitioner filed its returns for the taxable years involved with the collector of internal revenue for the fourteenth district of New York. They were filed within extended periods allowed by the respondent. The returns were filed for calender years on the basis of an accrual method of accounting.

### *Petitioner's Excess Profits Tax Liability.*

The following schedule shows, for each of the taxable years involved, petitioner's excess profits net income (as adjusted by the respondent or as reported) computed under the income method, the excess profits credits computed with the benefit of section 713(f), and the excess profits tax liability finally determined by the respondent without the benefit of section 722:

| Year | Excess profits net income | Excess profits credit, sec. 713(f) | Excess profits tax liability |
|---|---|---|---|
| 1940 | [1] $258,751.49 | $145,555.79 | $34,778.28 |
| 1941 | [1] 587,189.34 | 174,970.35 | 199,189.45 |
| 1942 | [2] 664,766.66 | 174,533.75 | 212,493.20 |

[1] According to revenue agent's report.
[2] As reported and prior to respondent's adjustments which are not shown in the record.

The petitioner computed its excess profits taxes in its returns under the income method, and the respondent's determinations thereof were made on the same basis.

In the computation of the excess profits tax liability shown above, petitioner had the advantage of the so-called growth formula under section 713(f), whereby the statutory average base period net income under section 713(f) was substantially higher than the arithmetic average of petitioner's excess profits net income for the base period, as shown in the schedules set forth below. The application of the growth formula had the effect of making the average base period net income so determined equal to the excess profits net income of 1939, the highest amount in any year in the base period. Because of claims of petitioner for carryover and carryback of unused excess profits credits, the parties have agreed upon the respective amounts of average base period net income computed under section 713(f) applicable to the years 1940 through 1944.

The amounts of petitioner's excess profits net income for the base period years 1936–1939, inclusive, applicable to the years 1940 through 1944 and the arithmetic averages are as follows:

|  | For 1940 | For 1941 | For 1942 | For 1943 | For 1944 |
|---|---|---|---|---|---|
| 1936 | $32,304.09 | $32,304.09 | $32,304.09 | $32,304.09 | $32,304.09 |
| 1937 | 15,867.93 | 33,731.46 | 33,731.46 | 33,731.46 | 35,077.53 |
| 1938 | 84,542.19 | 95,790.95 | 95,790.95 | 95,790.95 | 98,339.12 |
| 1939 | 153,216.62 | 184,179.32 | 183,719.74 | 184,118.21 | 184,179.32 |
| Total | 285,930.83 | 346,005.82 | 345,546.24 | 345,944.71 | 349,900.06 |
| Average | 71,482.71 | 86,501.45 | 86,386.56 | 86,486.18 | 87,475.02 |

Petitioner's normal-tax or special-class net income, or loss, and its excess profits tax net income, or loss, under 1941 law, for the years 1922 through 1939 as finally determined by the respondent and agreed to by the petitioner were as follows:

| Year | Normal-tax or special-class net income (or loss) | Revised excess profits net income (or loss) under 1941 law | Year | Normal-tax or special-class net income (or loss) | Revised excess profits net income (or loss) under 1941 law |
|---|---|---|---|---|---|
| 1922 | [1] $254,169.48 | $264,209.99 | 1931 | $58,130.92 | $130,224.32 |
| 1923 | 486,873.99 | 570,234.96 | 1932 | (46,800.55) | 22,935.25 |
| 1924 | 571,777.25 | 583,264.85 | 1933 | (146,881.93) | (76,350.35) |
| 1925 | 172,360.09 | 189,986.16 | 1934 | (125,457.71) | (106,416.83) |
| 1926 | 358,480.57 | 398,886.16 | 1935 | (46,047.99) | (20,131.10) |
| 1927 | 504,518.67 | 514,460.30 | 1936 | (16,023.30) | 48,876.86 |
| 1928 | 558,183.89 | 509,321.56 | 1937 | 137,897.64 | 172,720.50 |
| 1929 | 589,375.25 | 681,173.82 | 1938 | 75,627.15 | 98,339.12 |
| 1930 | 691,538.89 | 774,946.49 | 1939 | 185,515.36 | 184,179.32 |

[1] After eliminating net operating loss deduction.

Petitioner made no effort during the trial of this case to show what portion of its total overall profit (or loss) for any year could properly

be allocated to its manufacture and sale of underground fibre conduit or to its corresponding activities with respect to any other separable class or products.

The amounts of petitioner's average base period net income computed under section 713 (f), applicable to the years 1940–1944, and the excess profits credit under 713 (f) are set forth in the following schedule, together with the arithmetic averages of the base-period-years excess profits net income:

| Applicable to the years— | Arith. ABPEPNI | Sec. 713(f) ABPNI [1] | Sec. 713(f) EPC |
|---|---|---|---|
| 1940 | $71,482.71 | $153,216.62 | $145,555.79 |
| 1941 | 86,501.45 | 184,179.32 | 174,970.35 |
| 1942 | 86,386.56 | 183,719.74 | 174,533.75 |
| 1943 | 86,486.18 | 184,118.21 | 174,912.30 |
| 1944 | 87,475.02 | 184,179.32 | 174,970.35 |

[1] Computation of average of base period net income varies, depending on the excess profits taxable year for which a computation is made.

Petitioner's net income or loss for its base period years 1936–1939, as finally adjusted after audit by the respondent, amounted to the following: 1936, ($14,413.21); 1937, $139,912.64; 1938, $77,642.15; and 1939, $187,039.27 (which amounts include interest on Government obligations issued before March 1, 1941, that was properly deducted in computing normal-tax or special-class net income). Respondent made adjustments of the above amounts of base period net income in determining the amounts of excess profits net income of each of the base period years applicable to the excess profits years 1940–1942, for the purpose of computing petitioner's excess profits tax liability without the benefit of section 722. The following schedule shows such adjustments in base period excess profits net income applicable to excess profits taxable year 1942. The amounts of base period excess profits net income applicable to 1942 differ from the corresponding amounts applicable to 1940 only by reason of the deduction of base period income taxes in computing average base period net income for 1940, which were $17,863.53, $11,248.76, and $30,503.12 for 1937, 1938, and 1939, respectively. The adjustments in the several amounts of normal-tax or special-class net income which were made by the respondent in computing the respective amounts of the statutory average base period net income to be used for each of the excess profits tax years 1941, 1943, and 1944 were not identical in every detail for any two excess profits tax years but in each instance differed in only minor respects from the corresponding adjustments made for the year 1942 which are set forth in the following schedule. All of the varying amounts of base period excess profits net income resulting from the somewhat different adjustments are of the same general magnitude and relative effect. Joint Exhibit 10–J, which sets forth the complete

details of all of the adjustments, is incorporated herein by this reference:

| | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Net income_____ | ($14,413.21) | $139,912.64 | $77,642.15 | $187,039.27 |
| Less: Interest on Government obligations issued before Mar. 1, 1941_____ | 1,610.09 | 2,015.00 | 2,015.00 | 1,523.91 |
| Normal-tax or special-class net income_____ | (16,023.30) | 137,897.64 | 75,627.15 | 185,515.36 |
| Add: Capital loss_____ | 2,000.00 | 2,000.00 | 2,000.00 | 0 |
| | (14,023.30) | 139,897.64 | 77,627.15 | 185,515.36 |
| Less: Capital gain_____ | 0 | 0 | 0 | 2,127.40 |
| | (14,023.30) | 139,897.64 | 77,627.15 | 183,387.96 |
| Add: Net short-term gain_____ | 0 | 502.77 | 455.73 | 331.78 |
| | (14,023.30) | 140,400.41 | 78,082.88 | 183,719.74 |
| Less: Net loss from sale or exchange of property other than capital assets_____ | 0 | 130,707.34 | 0 | 0 |
| | (14,023.30) | 9,693.07 | 78,082.88 | 183,719.74 |
| Add: Demolition and abandonment losses_____ | 46,327.39 | 24,038.39 | 1,532.06 | 0 |
| Other abnormal deductions_____ | 0 | 0 | [1] 19,050.00 | 0 |
| | 32,304.09 | 33,731.46 | 98,664.94 | 183,719.74 |
| Less: Net gain from sale or exchange of capital assets_____ | 0 | 0 | 2,873.99 | 0 |
| Excess profits net income for 1942_____ | 32,304.09 | 33,731.46 | 95,790.95 | 183,719.74 |

[1] This item represents the major portion of a certain fee for industrial engineering services rendered by George S. May Company. This firm conducted a survey of petitioner's operations and recommended the adoption of several changes therein to improve the efficiency of various departments. Some of these recommendations were put into effect but the record does not show either the nature of the changes involved or the extent to which, if any, such changes resulted in reduced expenses or increased income.

### GENERAL FACTS.

Petitioner, a New York corporation, was organized and began business in 1893. Its corporate name was The Fibre Conduit Company until 1947 when its name was changed to Orangeburg Manufacturing Co., Inc. It has maintained at all times its principal office and factory in Orangeburg, New York. It has a sales office in New York City.

Petitioner's registered trademark is "Orangeburg," and at all times its products have been sold under that trade name.

Petitioner's capital stock was $600,000 in 1922, and before. In 1924 a stock dividend of 100 percent was declared, thereby increasing the capital stock to $1,200,000. There has not been any change in the amount of the capital stock since 1924.

The petitioner corporation was organized by Stephen R. Bradley and his brother. When the latter Bradley died, his stock was inherited by a son and two daughters, William C. Bradley, May Bradley, and Mrs. George L. Chapman. Stephen R. Bradley was the petitioner's president until August 18, 1925, when he retired. In about 1915, William C. Bradley's association with the corporation ended. In about 1934, and before, the outstanding stock of the corporation was 48,000 shares which were held, roughly, as follows: By certain members of the Bradley family and other individuals, John S.

Cravens, and the Johns-Manville corporation. Johns-Manville subsequently disposed of all of its stock and is no longer a stockholder.

In the earlier years of petitioner's business, up to 1925, the chief officers were Stephen R. Bradley, president, and A. M. Cregier, a vice president. Cregier, a graduate engineer, became associated with the corporation in the early 1900's as a plant superintendent, and remained for over 31 years. Cregier became president in August 1925; he held that office until he died, on February 5, 1936. At the time of Cregier's death, H. J. Robertson, Jr., was a vice president, who was in charge of sales. Robertson became president in 1936.

Robertson was employed by petitioner in 1925, when he was 27 years old, and received thorough training in the business. He became Cregier's assistant in about 1926. His father-in-law was W. C. Bradley, a substantial stockholder. Robertson became the sales manager of the underfloor duct division of the business in 1928. In 1931 he became a vice president and a director. He has been interested primarily in the promotion of the sales, the improvement of products, and the development of new products.

Petitioner's business at all times has been the manufacture of tubes out of a material which is 25 percent cellulose fibre and 75 percent tar pitch. All of petitioner's products are made from this product.

Depending upon the end-use of petitioner's products, they are called either conduit, pipe, or duct. Conduit is a term generally applied to a tube which is laid underground and receives, holds, and protects electric wires and cables. The term pipe describes a tube used to conduct fluids. The term duct is used to describe a tubular runway or raceway for electric power and telephone cables and wires. Petitioner's conduit and pipe are used in underground installations; the duct is used in underfloor installations.

During the base period years, petitioner made pipe, conduit, duct, and the necessary nonmetallic fittings such as joints, couplings, ends, caps, plugs, elbows, and similar parts which are required in laying a system of pipes, conduit, and ducts; all of such parts are made of the same pulp-bituminous material. Petitioner also made some miscellaneous items called specialties.

The material used in the making of all of petitioner's products, when dried, is a black, hard, and comparatively lightweight substance. It can be tooled on a tooling lathe, cut with a course edge wood saw, and holes can be cut through. The products called conduit and pipe look alike and except for differences in diameters, sizes, and wall thickness they are alike; apart from the various end-uses, they look like hard, black pipe; the term conduit indicates end-use. The

ducts differ in shape and size; they are semioval tubes with a flat bottom, some of which are fitted with metal fittings which petitioner bought during the material years.

During the course of petitioner's business, it has made various developments and improvements in the basic material used, the manufacturing process, and its products. In the earliest years the basic material was made of woodpulp and asphaltic pitches. At some time in the early 1920's, prior to 1925, waste newspaper pulp was substituted. In the early 1930's, petitioner began to use an improved type of hard coal tar pitch, at the time it adopted a vacuum process for treating and impregnating the fibrous material, which is hereinafter described. Also, in the earlier years, the conduit was made in relatively few sizes and only one type of joint, a "socket joint," was made. Later, in about 1929, a sleeve type of joint with a coupling was used, the Harrington joint. Petitioner made conduit in 5-foot lengths prior to 1930. In 1930, it added 8-foot lengths; after 1930, the major part of its conduit was made in 8-foot lengths. In 1929, other manufacturers of fibre conduit and petitioner agreed on certain standard specifications for the industry after which the control of dimensions and mechanical characteristics became more exacting. In 1931 petitioner erected its No. 3 mill and made changes in all operating departments.

All of petitioner's products are made with the same machinery and under the same processes. The products were made during the material years in various sizes with inside diameters ranging from 1 to 4, to 6, to 8 inches and with different wall thicknesses. During the relevant years about 80 percent of the chief products (other than duct) were made in the 4-inch diameter size.

The pulp and pitch material is immune to soil corrosion and is highly resistant to the corrosive action of dilute alkaline, inorganic acid, and chemical fluids.

The manufacturing process used in the material years involved these steps: (1) Waste newspaper is made into pulp which is cleaned and refined. (2) The pulp material is run through machines which roll it into tubes of particular lengths, diameters, and sizes. (3) The tubes are dried in ovens. (4) The white tubes are next treated or impregnated with a bituminous pitch at predetermined temperatures. (5) The final steps involve finishing the product.

Beginning in 1893, petitioner manufactured its pipelike product chiefly for use by electric utility companies as underground electric cable conduit. At all times conduit has been its chief product and it has been sold chiefly to electric utility corporations and also to some

industrial concerns. The major part of its production of conduit, at least 90 percent, was sold to electric utilities throughout the United States during the years 1922–1939.

Until 1923, petitioner's production was exclusively electric conduit, and pipe was its minor product. In 1923, petitioner began the manufacture of a new product, underfloor duct, for use as raceways for wires and cables, but electric conduit continued to be its chief product in terms of volume and sales.

In about 1928, consideration was given to other potential uses of fibre tubes and it was recognized that another use was for sewer and drainpipe. However, up to 1937, petitioner's chief products were conduit and duct.

From 1893 until 1937, the only kind of conduit made by petitioner, its standard conduit, was the type which is encased in concrete after it is laid in the ground. In about 1936 petitioner developed a heavier wall conduit, identified as Type II, which could be laid underground without a concrete encasement. It is referred to hereinafter.

Petitioner's standard conduit was and is installed by electric utilities in built-up tiers of from 6 to 16 conduit, or 20 to 26, or up to 64, making a bank of conduit running from manhole to manhole. Concrete is poured between and around the lines of conduit and around an entire group or bank. At the points where manholes are located electric cables are pulled through the raceways provided by the encased fibre conduit.

In November 1921, petitioner obtained a license from a syndicate and the inventor of an underfloor duct system to make and sell fibre duct systems, a gridiron of ducts, junction boxes, and metallic fittings which are laid in concrete floors at the time a building is constructed. The ducts are raceways holding telephone and electric wires which are readily accessible through outlets for telephone and electric service to tenants. The invention of an underfloor duct system brought about a major change in the method of wiring commercial buildings for electric and communications service. Underfloor duct became petitioner's second major product, which it began selling in 1923. During the years 1923 through 1939, underfloor duct constituted in volume and sales petitioner's second largest product. Underfloor duct systems were installed in commercial, industrial, public, and institutional buildings. Specifications for the installation of such underfloor systems are made in the plans for new buildings. The duct systems are sold to the electric contractors who install the wiring.

By the end of 1939, petitioner's products were standard conduit, Type I; heavy-wall conduit, Type II; underfloor duct; drain and sewer pipe; perforated drainpipe (pipe with holes drilled in certain areas) for septic tank drainage beds; and a small class of miscellaneous items called specialties.

Petitioner has operated its plant at Orangeburg since 1893. After about December 31, 1931, during the material years, all of petitioner's manufacturing operations were carried on at the Orangeburg plant. Prior to the end of 1931, petitioner operated other plants at different locations from time to time.

In May 1922, petitioner purchased the entire property of American Conduit Company, including its plant at Fulton, New York. It operated the Fulton plant until March 31, 1925. In 1922, petitioner also purchased the operating equipment of Fibre Corporation (which was wholly owned by Johns-Manville Corporation) including its plant at Lockport, New York. Petitioner paid for the equipment by issuing stock to Johns-Manville. Under the purchase agreement with Fibre Corporation, the latter company produced conduit with materials provided by petitioner and petitioner received and sold the products. This arrangement was carried on for about 9 months, until March 31, 1923. Subsequently, in 1923, petitioner sold all of the machinery and equipment acquired from Fibre Corporation at a book loss of $74,711.

In 1924, petitioner constructed a new plant in Richmond, Indiana, which was put into operation in the same year and was kept in operation through 1930, for about 5 years. Production there was gradually reduced during 1931 and 50 percent of the plant was closed by May 31, 1931. All but 5 percent of the remainder of the plant was closed and all manufacturing operations were concluded by December 31, 1931. The part of the Richmond plant which was not closed was used only for warehouse and shipping purposes until May 1, 1936. On about May 31, 1936, the building, machinery, and equipment were offered for sale. Certain important items of machinery and equipment were moved from the Richmond to the Orangeburg plant; certain items were scrapped. The land, building, and remaining items of machinery and equipment were sold in 1937 to the Johns-Manville Corporation, at a loss. Thereafter, during the years material in this proceeding, petitioner's manufacturing operations were confined to its Orangeburg plant.

The following schedule shows the total depreciable assets, the total of all assets, and the total combined capital stock and surplus of

petitioner as stated in the closing balance sheets in petitioner's income tax returns for the years 1922–1939, inclusive:

| Year | Total depreciable assets | | Total assets | Combined capital stock [1] and surplus |
| --- | --- | --- | --- | --- |
| | Original cost | Net book value | | |
| 1922 | $708,939 | $463,303 | $950,720 | $697,699 |
| 1923 | 962,861 | 689,441 | 1,360,537 | 1,027,658 |
| 1924 | 1,427,415 | 1,072,160 | 1,614,340 | 1,419,630 |
| 1925 | 1,441,406 | 986,510 | 1,519,159 | 1,460,155 |
| 1926 | 1,424,727 | 885,965 | 1,766,899 | 1,562,286 |
| 1927 | 1,496,988 | 920.991 | 2,097,883 | 1,849,869 |
| 1928 | 1,552,165 | 904,314 | 2,255,861 | 2,015,530 |
| 1929 | 1,481,028 | 810,122 | 2,384,191 | 2,135,487 |
| 1930 | 1,661,188 | 925,769 | 2,472,500 | 2,307,588 |
| 1931 | 2,037,224 | 1,215,198 | 2,101,753 | 2,040,927 |
| 1932 | 2,087,542 | 1,135,640 | 2,047,856 | 2,000,884 |
| 1933 | 2,106,993 | 1,022,049 | 1,900,931 | 1,860,438 |
| 1934 | 2,127,725 | 979,258 | 1,782,887 | 1,738,650 |
| 1935 | 2,134,181 | 919,588 | 1,717,941 | 1,678,017 |
| 1936 | 2,061,588 | 831,622 | 1,631,026 | 1,534,007 |
| 1937 | 1,282,817 | 539,149 | 1,557,676 | 1,397,217 |
| 1938 | 1,210.846 | 519,937 | 1,441,623 | 1,356,520 |
| 1939 | 1,228,715 | 527,518 | 1,495,012 | 1,366,618 |

[1] The total capital stock was $600,000 at the end of 1922 and remained unchanged through 1923. It was increased to $1,200,000 by the issuance of a 100-percent stock dividend in 1924 and remained at $1,200,000 throughout all the remaining years.

The following schedule shows petitioner's total net sales, gross profit, and net income (as adjusted by the Commissioner) for the years 1922–1939, inclusive:

| Year | Net sales [1] | Gross profit [1] | Net income (or loss) |
| --- | --- | --- | --- |
| 1922 | $1,199,352.12 | $531,135.63 | [2] $254,169.48 |
| 1923 | 2,163,160.10 | 1,014,087.40 | 486,873.99 |
| 1924 | 1,910,614.26 | 1,064,731.51 | 571,777.25 |
| 1925 | 1,247,106.38 | 570,199.44 | 172,360.09 |
| 1926 | 1,651,904.49 | 809,963.45 | 358,480.57 |
| 1927 | 1,865,991.65 | 980,726.54 | 504,518.65 |
| 1928 | 2,213,841.55 | 1,080,343.18 | 558,183.39 |
| 1929 | 2,433,418.05 | 1,235,696.70 | 589,375.25 |
| 1930 | 2,493,074.87 | 1,369,264.17 | 691,538.89 |
| 1931 | 1,270,977.75 | 605,340.87 | 58,130.92 |
| 1932 | 808,374.49 | 377,938.06 | (46,800.55) |
| 1933 | 566,035.64 | 207,779.37 | (146,881.93) |
| 1934 | 441,557.19 | 153,162.67 | (120,500.90) |
| 1935 | 436,617.70 | 186,343.01 | (43,242.78) |
| 1936 | 680,196.06 | 275,395.99 | (14,413.21) |
| 1937 | 781,472.08 | 420,496.44 | 139,912.64 |
| 1938 | 725,722.49 | 350,200.94 | 77,642.15 |
| 1939 | 884,297.48 | 440,935.36 | 187,039.27 |

[1] Net sales means gross sales, less returns and allowances. Gross profit means gross profit from manufacturing.
[2] After eliminating net operating loss deduction.

## Selling Arrangements, 1922 Through 1939.

In 1922 petitioner purchased the machinery and operating equipment of Fibre Corporation, located in Lockport, New York, which was wholly owned by Johns-Manville Company. Petitioner issued shares of its common stock to Johns-Manville in payment and Johns-Manville thereby acquired a substantial stock interest in petitioner. Its stock interest in petitioner was reduced in 1937, when petitioner reacquired most of the stock from Johns-Manville in payment for

its plant at Richmond, Indiana, which Johns-Manville purchased. In 1941, Johns-Manville ceased to be a stockholder.

In 1922 Johns-Manville, under a contract with petitioner, became the sole and exclusive distributor or jobber of all of petitioner's products on a commission basis. At that time, Johns-Manville did not directly or indirectly sell underground electric conduit; petitioner had taken over the operations of the Fibre Corporation, as stated above. Johns-Manville manufactured other products, such as building materials and various kinds of pipes; it was not primarily a manufacturer of electrical products. Johns-Manville was not a jobber for any manufacturer other than petitioner; it sold its own products. Under the sales agency contract, petitioner's products were to be sold under petitioner's trade name, Orangeburg.

When petitioner added the underfloor duct system to its products, the Johns-Manville contract was understood to include that product also.

In December 1922 Johns-Manville arranged for distribution of petitioner's products in Great Britain and some of its dominions through a contract with a British corporation, Key Engineering Company, Ltd., which was made an exclusive foreign distributor of petitioner's products.

Under the Johns-Manville agency agreement, petitioner's products were distributed on a national basis.

Johns-Manville continued to be the exclusive distributor of petitioner's underfloor duct production until sometime in 1928, when petitioner took the selling of floor duct away from Johns-Manville and undertook for a short time selling that product itself through a newly created selling division of which Robertson was in charge. Petitioner's office in New York City was enlarged to handle sales of floor duct and salesmen were employed. Petitioner's selling efforts included contacting architects and engineers who developed plans for new buildings as well as electric contractors who were the potential buyers of floor duct.

On November 13, 1929, petitioner and General Electric Company entered into an agreement whereby petitioner agreed to make a special type of underfloor duct systems for General Electric, to be sold under the label of General Electric; petitioner also agreed not to sell to others the same kind of floor duct system which it was to make for General Electric. This agreement was amended in 1932, which amendment is referred to hereinafter. The arrangement with General Electric continued throughout the years material in this proceeding.

Johns-Manville continued to be the exclusive distributor of petitioner's other products, consisting chiefly of underground electric conduit, until the early part of 1934 when petitioner entered into a

nonexclusive contract with Graybar Electric Company, which had been the distributor for petitioner's principal competitor, Brown Company. Brown and Graybar had had a disagreement prior to 1934, and thereafter Graybar approached petitioner. Graybar was a distributor of petitioner's products during the remaining years which are material.

Petitioner entered into the nonexclusive distributor agreement with Graybar on May 1, 1934. Under this agreement Graybar distributed petitioner's underground electric conduit and pipe. Graybar is primarily a distributor and jobber of electrical equipment and has a very large organization throughout the United States. It provided many more distributing outlets than Johns-Manville.

At about the same time that petitioner entered into the agreement with Graybar, it also entered into a nonexclusive distribution agreement, in 1934, with General Electric Supply Company, a distribution organization similar to Graybar. General Electric Supply had had a subagency agreement with Johns-Manville for the sale of petitioner's electric conduit. Upon the termination of the Johns-Manville contract, petitioner negotiated directly with General Electric Supply Company. Under petitioner's contract, General Electric Supply received an agency to sell petitioner's electric conduit and pipe, also, which arrangement continued during the relevant years. General Electric Supply Company, like Graybar, has many distributing warehouses and sales offices throughout the entire United States and it sells primarily to the electric utility industry. Both are sales representatives, distributors, and jobbers of electrical machinery, equipment, and appliances used in connection with the production, transmission, distribution, and use of electricity.

In addition, after terminating the contract with Johns-Manville in 1934, petitioner made an agreement in 1934 with Fibre Conduits of Canada and Dominion Tar & Chemical Company, Ltd. (the parent of Fibre Conduits), whereby Key Engineering was to obtain electric conduit from either Dominion Tar or Fibre Conduits and petitioner was to receive commissions on sales to and through Key Engineering (the British distributor) in lieu of making sales directly to Key. Furthermore, in 1934, petitioner appointed International General Electric as its distributor for electric conduit in the export market. Also, petitioner subsequently appointed International Standard Electric Company, a subsidiary of International Telephone & Telegraph Company, as a distributor in the export market.

*Underground Electric Conduit Systems In General.*

The earliest successful attempt (in the United States) to place underground a system of electric conductors for lighting service was

that invented and installed by Thomas A. Edison, known as the Edison Tube System, in the area supplied from the Pearl Street Station in New York City. This was accomplished on September 4, 1882, when current was turned into an underground system consisting of electric conductors enclosed in iron pipes. Thereafter, various types of underground conduit systems, also called duct systems, were developed which were of two classes, inflexible and flexible systems.

Most of the underground conduit or duct systems used by the electric light and power industry are generally classified as distribution rather than transmission facilities. The transmission lines of electric light and power companies are used for the transfer of electricity in bulk between generating plants and switching stations or substations and generally carry much higher voltages than the distribution lines. Pressure systems involving the use of hydrogen gas or oil and a metallic conduit such as steel pipe have generally been used for the installation of underground transmission lines whenever the voltages to be carried run up beyond a certain point.

Underground systems of distributing electric energy involve many factors, technological, engineering, and economic, which are not involved in the conventional open-wire overhead systems of transmission and distribution. The adoption of underground systems is directly related to the growth cities, the concentration in cities of business activities and population, and the consequent increase in the volume of electric energy. Underground construction is often necessary for high-load-density urban areas where lack of space and building congestion restrict the possible installation of pole lines. As municipalities grow, overhead electric wire systems are removed because they become obstructions, and they are replaced by underground systems. By 1930, underground systems had been long established in the larger American cities. Since the cost of underground construction is nearly always greater than the cost of the equivalent overhead construction, underground lines have been restricted almost entirely to localities where considerations other than lowest cost are of primary importance, such localities usually being cities. The cost of constructing an underground system may be from 10 to 50 times as much as the cost of putting up an overhead system.

On the other hand, in most suburban areas, smaller municipalities, and rural areas, electric energy is distributed by the conventional overhead systems. Among the reasons are lower demand and consumption as well as the lower costs of construction.

The earliest underground systems were of the "inflexible" type, so called because after the burial in the ground of conductors, in suitable enclosures, no changes or repairs can be made without reopening the ground. The inherent disadvantage of the inflexible system early lead to the introduction of conduits or raceways into which and from

which cables could be drawn or withdrawn, respectively, without disturbing the overlying earth and street surfaces. They constituted the "flexible" systems which came to be used largely by both electric power and light and communications companies. Probably the first installation of a flexible system in the United States was made in Boston by the American Bell Telephone Company in 1882 and 1883. There are, of course, many and various kinds of flexible conduit systems. Some of them have particular disadvantages. Desirable features of a flexible system are that the system and the conduits are such as to facilitate replacing existing conductors with larger ones when the installed system becomes outgrown, the addition of more cables, and the substitution of higher voltage cables. Flexible systems have been preferred on account of the expense and inconvenience of digging and cutting through pavement to make repairs and replacements.

The petitioner entered into the field of producing underground conduit in 1893. It made and still makes conduit for use in flexible underground systems.

Many materials have been used for the walls of underground conduit. The following relates to some of the earlier materials:

In the late 1800's, pipes made of wrought iron or a good-quality steel, encased in concrete were used.

Pump logs, originally laid only for water-supply distribution, were found to be readily adaptable to underground electrical distribution. An underground system of pump logs was installed by the Western Union Telegraph Company in 1883 in the City of Washington, D.C. Pump logs are trimmed square on the outside to certain dimensions (like railroad ties), a 2-inch hole is bored through the wood, and the pump log is treated with creosote oils to fill the cellular structure of the wood. A creosoted pump log system was installed in Brooklyn in 1884. Pump log is normally installed without concrete encasement.

Another type of conduit which was used in the early years was the single-duct clay tile conduit, called Camp tile, which was made in sections about 2 feet long with a 3-inch circular bore. Conduit made of Camp clay tile are still being used. The first single-duct clay conduit was installed in 1891 in Cincinnati for telephone cables, and soon thereafter single-duct clay tile conduit were installed for underground electrical distribution in Boston, Detroit, and Philadelphia. In 1895 multiple-duct clay tile conduit was made for a railroad company in Chicago; later it was used and is still used by communication companies. Prior to 1915, single-duct clay tile was widely used for underground electric conduit.

In about 1890, electrical contractors in New York City became interested in creating a material which would compete with materials then used for underground electric conduit systems, namely, Edison tubes, creosoted pump log, iron pipe, and single-duct clay tile. A

process was developed for forming a tube or conduit of woodpulp fibre treated with an asphaltum compound. The manufacture of this material was begun in 1893 by Fibre Conduit Company at Orangeburg, New York, the petitioner in this proceeding. Fibre conduit became widely used by electric light and power companies.

Terra cotta (tile) conduit in 2-foot sections also have been used.

A good many years after the development of fibre tubes, or pipes, and the use thereof for underground electric conduit, there were developed ducts, or conduit, made of concrete, asbestos cement, cement, and soapstone. These later developments are referred to hereinafter.

From the beginning of the use of underground electric conduit systems, it has been customary to install lines of several conduit in banks, i.e., a number of ducts joined in a bank. The determination of the number of ducts to be built in a trunkline involves planning for future as well as present use. It is customary to designate the number of ducts, or conduit, to be installed as (a) ducts presently required; (b) spare ducts for which use within a few years can be expected; and (c) supernumerary ducts.

Designing and planning for the future requirements of an area served by underground conduit cover a wide range of possibilities. Individual electric light and power companies have adopted various plans from time to time. The difficulties of estimating in advance economical and practical features as well as future needs have been learned through experience by individual electric utility companies. However, it was the general practice of the electric light and power companies to anticipate their needs for underground duct for a substantial number of years in the future so that they would not have to dig up streets and incur the other expenses necessary to install additional banks of conduit to serve the same physical area.

The expenditures of electric light and power companies for construction and facts relating more particularly to their installations of underground conduit systems are set forth hereinafter.

*Petitioner's Position and Competition in the Conduit Field.*

From 1893 to 1922, as far as the record here shows, petitioner was one of the chief producers of fibre tubes used for underground electric conduit, and there were few other significant manufacturers. Prior to 1922, two other producers of fibre conduit were American Conduit Company at Fulton, New York, and the Fibre Corporation at Lockport, New York (controlled by Johns-Manville). In May 1922, petitioner took over the operations of both competitors. It purchased the plant of American Conduit Company for more than $220,000; and it purchased for an agreed price of $129,227 the operating equipment of Fibre Corporation. (Both acquisitions and petitioner's use of the Fulton and Lockport plants have been referred to hereinbefore.)

For a short time after the acquistion of these competitors' facilities, petitioner was the only producer of fibre conduit.

In the latter part of 1923, the Brown Company of Berlin, New Hampshire (hereinafter referred to as Brown), a manufacturer of pulp and paper, commenced to make a product out of pulp and bituminous compound similar to that made by petitioner. In 1928, Line Material Company (called Line hereinafter) in Milwaukee, Wisconsin, started making fibre conduit for underground use out of pulp and bituminous compound at its plant at Barton, Wisconsin. Line also made a variety of products, such as pole line hardware, used in the construction of overhead electric systems. The production of fibre underground conduit, in thousands of feet and thousands of dollars, of Brown during the years 1924 through 1939, and of Line during 1928–1939 are set forth in the following table:

| Year | Brown Company | | Line Material Company | |
|---|---|---|---|---|
| | Thousands of feet | Thousands of dollars [1] | Thousands of feet | Thousands of dollars |
| 1922 | [2] NA | [2] NA | 0 | 0 |
| 1923 | [2] NA | [2] NA | 0 | 0 |
| 1924 | 9, 943 | $983 | 0 | 0 |
| 1925 | 15, 883 | 1, 546 | 0 | 0 |
| 1926 | 14, 945 | 1, 662 | 0 | 0 |
| 1927 | 17, 387 | 2, 120 | 0 | 0 |
| 1928 | 14, 926 | 2, 023 | 24 | $4 |
| 1929 | 22, 017 | 2, 632 | 307 | 49 |
| 1930 | 19, 255 | 2, 285 | 362 | 58 |
| 1931 | 7, 732 | 1, 066 | 1, 123 | 180 |
| 1932 | 3, 424 | 510 | 1, 070 | 171 |
| 1933 | 2, 380 | 393 | 766 | 123 |
| 1934 | 2, 710 | 661 | 1, 672 | 189 |
| 1935 | 1, 733 | 122 | 2, 306 | 228 |
| 1936 | 3, 026 | 380 | 2, 295 | 227 |
| 1937 | 3, 144 | 485 | 2, 741 | 310 |
| 1938 | 2, 584 | 330 | 2, 334 | 285 |
| 1939 | 2, 629 | 425 | 2, 958 | 314 |

[1] These dollar figures are overstated by including the dollar sales of a product made for winding paper and textiles known as the Bermico Core, which would not account for more than 10 percent of the total indicated for any year.
[2] Not available.

The following table shows petitioner's sales of fibre conduit in thousands of feet and dollars for the years 1922 through 1939: [1]

PETITIONER'S SALES OF UNDERGROUND FIBRE CONDUIT

| Year | Thousands of feet | Total sales | Year | Thousands of feet | Total sales |
|---|---|---|---|---|---|
| 1922 | 12, 836 | $1, 199, 352. 12 | 1931 | 9, 896 | $1, 110, 452. 40 |
| 1923 | 20, 811 | 2, 119, 782. 06 | 1932 | 5, 688 | 619, 229. 41 |
| 1924 | 17, 810 | 1, 878, 255. 88 | 1933 | 3, 609 | 377, 050. 47 |
| 1925 | 11, 209 | 1, 183, 379. 03 | 1934 | 3, 562 | 374, 773. 11 |
| 1926 | 14, 039 | 1, 496, 221. 00 | 1935 | 3, 331 | 359, 114. 71 |
| 1927 | 15, 548 | 1, 632, 702. 71 | 1936 | 5, 251 | 530, 347. 21 |
| 1928 | 16, 099 | 1, 713, 358. 81 | 1937 | 6, 187 | 649, 267. 21 |
| 1929 | 19, 188 | 2, 073, 746. 03 | 1938 | 3, 801 | 433, 172. 06 |
| 1930 | 17, 321 | 1, 986, 311. 95 | 1939 | 5, 042 | 520, 358. 52 |

[1] The record is not clear about whether the figures for thousands of feet of conduit sold during 1923–1928, inclusive, are accurate. It appears that they may be less than the

The combined sales of petitioner, Brown, and Line during the period 1922 through 1939 in thousands of feet and dollars, the average for all three, and the average prices per foot obtained by petitioner are set forth in the following table, which is followed by an analysis with respect to averages and ratios: [2]

COMBINED SALES OF FIBRE CONDUIT OF PETITIONER, BROWN, AND LINE

| Year | Thousands of feet | Dollars | Average prices in cents per foot [1] | Average prices in cents per foot of petitioner |
|---|---|---|---|---|
| 1922 [2] | 12,836 | $1,199,352 | 0.093 | 0.093 |
| 1923 [2] | 20,811 | 2,119,782 | .102 | .102 |
| 1924 [2] | 27,753 | 2,861,255 | .102 | .104 |
| 1925 | 27,092 | 2,729,379 | .097 | .097 |
| 1926 | 28,984 | 3,158,221 | .107 | .103 |
| 1927 | 32,935 | 3,752,702 | .110 | .097 |
| 1928 [2] | 31,049 | 3,740,359 | .115 | .095 |
| 1929 | 41,512 | 4,754,746 | .115 | .108 |
| 1930 | 36,938 | 4,329,312 | .117 | .115 |
| 1931 | 18,751 | 2,356,452 | .126 | .112 |
| 1932 | 10,182 | 1,300,229 | .128 | .109 |
| 1933 | 6,755 | 893,050 | .132 | .104 |
| 1934 | 7,944 | 1,224,773 | .154 | .105 |
| 1935 | 7,370 | 709,115 | .096 | .108 |
| 1936 | 10,572 | 1,137,347 | .108 | .101 |
| 1937 | 12,072 | 1,444,627 | .120 | .105 |
| 1938 | 8,719 | 1,048,172 | .120 | .114 |
| 1939 | 10,629 | 1,259,358 | .118 | .103 |

[1] Average prices in cents per foot are approximate figures for the years 1922–1928 because of possible inaccuracy in petitioner's footage figures for those years; see footnote 1 to text. Also, some dollar amounts of sales of Brown for another product, Bermica Core, are included.

[2] For 1922 and 1923, petitioner's sales only are shown; for 1924, 1925, 1926, and 1927 the sales shown are of petitioner and Brown Company; and for the period 1928–1939, the sales of petitioner, Brown, and Line are shown.

AVERAGES OF COMBINED SALES OF CONDUIT

| Years | Thousands of feet | Dollars | Average cents per foot |
|---|---|---|---|
| 1922–1939 | 19,606 | $2,197,000 | 0.112 |
| 1925–1939 | 19,434 | 2,225,000 | .114 |
| 1936–1939 | 10,498 | 1,222,000 | .116 |

RATIO TO AVERAGE FOR 1922–1939

| | | |
|---|---|---|
| 53.5 | 55.6 | 103.6 |

RATIO TO AVERAGE FOR 1925–1939

| | | |
|---|---|---|
| 54.0 | 54.9 | 101.8 |

AVERAGE OF PRICES PER FOOT RECEIVED BY PETITIONER

| | |
|---|---|
| 1922–1939 | 0.103 |
| 1925–1939 | .104 |
| 1936–1939 | .105 |
| Ratio to average for 1922–1939 | 101.9 |
| Ratio to average for 1925–1939 | 101.0 |

actual footage sold in each year due to some adjustments made by the petitioner for the purposes of correcting some alleged inconsistencies in its accounting records, to which respondent objects. The dollar amounts of sales for these years reflect and are in accord with respondent's view. If the figures for thousands of feet sold during 1923–1928 should be correspondingly increased, such corrections cannot be made from the record before us. In any event, the adjustments would be small and are not of particular importance.

[2] For the purposes of this proceeding, the following schedule is roughly adequate although it may not be wholly exact with respect to the footage of petitioner's conduit sold in the 6 years 1923–1928. See footnote 1, *supra*.

The following schedule shows for the years 1924 through 1939 the dollar amounts of sales of fibre conduit of the three producers of that type of underground conduit, petitioner, Brown, and Line, together with the ratio of petitioner's sales to the combined sales of the three producers on the basis of the approximate footage of fibre conduit sold in each year:

| Year | Dollar sales | | | Ratio petitioner's sales to 3 manufacturers |
| | Petitioner | Brown | Line | |
| --- | --- | --- | --- | --- |
| | | | | (Thousands of feet) |
| 1924 | $1,878,256 | $983,000 | | [1] N.A. |
| 1925 | 1,183,379 | 1,546,000 | | 41.4 |
| 1926 | 1,496,221 | 1,662,000 | | 48.4 |
| 1927 | 1,632,703 | 2,120,000 | | 47.2 |
| 1928 | 1,713,359 | 2,023,000 | $4,000 | 51.8 |
| 1929 | 2,073,746 | 2,632,000 | 49,000 | 46.2 |
| 1930 | 1,986,311 | 2,285,000 | 58,000 | 46.9 |
| 1931 | 1,110,452 | 1,066,000 | 180,000 | 52.8 |
| 1932 | 619,229 | 510,000 | 171,000 | 55.9 |
| 1933 | 377,050 | 393,000 | 123,000 | 53.4 |
| 1934 | 374,773 | 661,000 | 189,000 | 44.8 |
| 1935 | 359,114 | 122,000 | 228,000 | 45.2 |
| 1936 | 530,347 | 380,000 | 227,000 | 49.7 |
| 1937 | 649,267 | 485,000 | 310,000 | 51.4 |
| 1938 | 433,172 | 330,000 | 285,000 | 43.6 |
| 1939 | 520,358 | 425,000 | 314,000 | 47.4 |

[1] NA means not shown.

At some time toward the end of 1937, petitioner commenced manufacturing a heavy-wall conduit which could be laid directly in the ground without any protective concrete encasement, the Type II conduit which petitioner called Nocrete.[3] This heavier wall conduit, with a wall thickness of about seven-sixteenths of an inch, was made for use in the construction of underground raceways for electric light and power lines, as was Type I, and differed from petitioner's standard conduit, Type I, only in the thickness of the wall (or shell) which made it possible to omit the concrete encasement required in the underground installation of the standard fibre conduit. Nocrete was sold through the same trade channels and distributors (Graybar and General Electric Supply) as the standard conduit. Petitioner's adoption of the vacuum method of treating white pulp tubes with coal tar pitch (referred to elsewhere) made possible the manufacture of a stronger basic pulp-bituminous material, which was the chief factor in the development of Nocrete.

[3] Petitioner claims that this represented a new product which was produced commercially for the first time during the base period and that sales did not reach by the end of the base period the level which would have been reached if sales had commenced 2 years earlier than 1937. Nocrete is involved in petitioner's claims under section 722(b)(4) and, later, is referred to again.

The following table shows the dollar sales of both types of fibre conduit, for convenience, in the event that the dollar sales of Nocrete should be considered along with the dollar sales of standard conduit:

| Year | Standard conduit sales | Nocrete conduit sales | Total sales |
|------|----------------------|---------------------|-------------|
| 1937 | $649,267 | $1,116 | $650,383 |
| 1938 | 433,172 | 86,846 | 520,018 |
| 1939 | 520,358 | 92,599 | 612,957 |
| 1940 | 775,850 | 122,458 | 898,308 |
| 1941 | 1,263,971 | 217,847 | 1,481,818 |
| 1942 | 1,496,767 | 383,962 | 1,880,729 |

It has been noted hereinbefore that other underground conduit for electric cable is made of pump log, clay, soapstone, and concrete. During the base period years, the chief, if not the only producers of fibre conduit were the petitioner, Brown, and Line. Fibre conduit competes with conduit made of other materials. For example, petitioner has never sold conduit to the electric light and power company in Chicago which uses concrete conduit. On the West Coast the chief competitive conduit in the early 1930's was single-duct clay conduit.

In the years 1929–1934, Johns-Manville worked on the development of a material made of asbestos fibre, Portland cement, and silica from which it eventually produced a new type of underground conduit for electric cables, to which it gave the trade name Transite Conduit. Transite is a trade name used by Johns-Manville since the early 1900's, which it has applied to many of its products. Transite Conduit could be buried directly in the ground without encasement in a concrete envelope and it is the type which is designated Type II in the Federal Bureau of Standards specifications for conduit. It is a heavy-wall conduit. Johns-Manville put Transite Conduit on the market in 1935. At that time petitioner did not make a heavy-wall underground conduit.

Johns-Manville made its conduit in various sizes, in diameters of from 2 to 4 to 6 inches.

Johns-Manville also made a thin-wall conduit of the same asbestos fibre-cement material which is installed in the ground with a concrete envelope, a Type I conduit. To this conduit, the name Korduct was given. In 1936, Johns-Manville began selling this product. It still makes both types of asbestos-cement conduit. Johns-Manville produced Transite Conduit and Korduct at its plant at Manville, New Jersey, in 1937, and at its plant in Watson, California, near Los Angeles, in 1936.

The following table shows Johns-Manville's sales of Transite Conduit and Korduct during the years 1935–1941:

| Year | Korduct, Type I | | Transite Conduit, Type II | |
|---|---|---|---|---|
| | Feet | Dollars | Feet | Dollars |
| 1935 | | | 730,000 | $121,053 |
| 1936 | 180,000 | $25,569 | 1,360,000 | 232,143 |
| 1937 | 675,000 | 91,207 | 1,850,000 | 315,038 |
| 1938 | 680,000 | 91,799 | 1,350,000 | 229,171 |
| 1939 | 1,060,000 | 143,218 | 1,840,000 | 312,854 |
| 1940 | 1,853,000 | 250,234 | 2,431,000 | 413,305 |
| 1941 | 4,091,000 | 552,519 | 4,163,000 | 707,747 |

The average price per foot of Korduct, in cents, was 0.142 in 1936, and 0.135 in the years 1937–1941.

In the early part of 1933, the Concrete Conduit Corporation in Corona, Long Island, began producing and selling a heavy concrete conduit which could be buried directly in the ground without the protection of a concrete encasement. This conduit was precast in a square form on the outside, and was round inside. In 1935, the Roman Stone Construction Company in Brooklyn began producing and selling a round concrete conduit for underground use. Both types of concrete conduit competed with petitioner's fibre conduit.

*Public Service Electric and Gas Company of Newark, New Jersey.*— Public Service of Newark is a privately owned public utility company which provides 80 percent of the electric energy used in New Jersey and the electric service used throughout the most highly industrialized and heavily populated part of New Jersey. The primary type of underground conduit which was installed by Public Service during the years 1922–1937, inclusive, was fibre conduit, which it purchased from the several manufacturers of fibre conduit. Three manufacturers were involved, Brown, Line, and petitioner. In the Public Service system, each manufacturer's product is represented by approximately equal quantities of installed conduit footage.

In 1936 and 1937, Public Service discovered a defect in the installed fibre conduit; many had developed blisters and bulges inside the conduit. The condition was found to be fairly widespread and of a serious nature. In some instances it was necessary to abandon conduit; also, additional maintenance and cleaning was required. The condition was found in an installation 10 miles long. Public Service called upon the manufacturers of the fibre conduit to make an investigation. The manufacturers appointed a technical committee, which included engineers of Public Service, to carry on an investigation of which B. G. Le Mieux, an employee of the petitioner and its director of research, was chairman. The committee's work extended over a lengthy period.

Petitioner's president, Robertson, reported to the directors of the petitioner in June 1942 about the findings of the committee, and in the early part of 1944 he made another report which included a report of Le Mieux about additional findings, laboratory tests to discover what factors in the manufacturing processes could contribute to the development of blisters, causes located in ground conditions peculiar to Public Service, and recommendations for improving manufacturing processes.

As of the beginning of 1938, Public Service terminated purchases of fibre conduit from the petitioner and others and during the following 19 years, at least, Public Service did not see fit to resume the general use of fibre conduit; it only used sample shipments in later years to test the quality of the samples. When Public Service decided at the beginning of 1938 not to install conduit made of pulp-bituminous material, the petitioner lost a customer, except for whatever very small amounts of conduit Public Service accepted for testing purposes. Brown and Line, also, lost a customer.

Since the beginning of 1938, Public Service has used Transite Conduit made by Johns-Manville, on a substantially exclusive basis, made of an asbestos-cement compound.

In 1944, petitioner, Brown, and Line, each, paid Public Service $10,000, or $30,000, to compensate it in part for the expenses incurred because of the defects in fibre conduit purchased from them.

*Consolidated Edison Company of New York.*—Consolidated Edison supplies electric energy in the 5 boroughs of New York City, Manhattan, Bronx, Brooklyn, Queens, and Richmond, and also in Westchester County. It was formed out of a consolidation of several individual electric light and power companies such as New York Edison, Brooklyn Edison, United Electric Light and Power Company, and others. Consolidated Telegraph and Electrical Subway Company, an affiliate of Consolidated Edison, builds the electric conduit systems in Manhattan and the Bronx and leases them to Consolidated Edison. In the records of Consolidated Edison are preserved the historic records of the individual companies which served the area of greater New York City prior to the consolidation.

Consolidated Edison had 31,198 cable miles of underground electric cable in place at the end of 1939, which represented more than one-third of the total underground electric cable in use by all of the privately owned electric utilities in the United States at that time.

In the whole Consolidated Edison system in the Greater New York City area fibre conduit was very largely used prior to 1931, and the petitioner sold its fibre conduit to the electric power companies in the system and, later, to Consolidated Edison. As early as 1931, the electric utility companies serving the Greater New York City area

began installing conduit made of concrete in substantial quantities, in addition to new installations of fibre conduit. The following table shows the number of feet of fibre conduit and of conduit made of another material, or materials, which was installed in this area during 1931–1933:

| Year | Fibre conduit | Conduit of other materials |
|------|--------------|---------------------------|
| | *Feet* | *Feet* |
| 1931 | 4,682,118 | 2,044,579 |
| 1932 | 3,252,206 | 2,882,687 |
| 1933 | 821,229 | 1,821,063 |
| | 8,755,553 | 6,748,329 |

During the period 1934–1939, inclusive, there was a substantial increase in the number of feet installed of conduit made of a material, or materials, other than fibre, and, correspondingly, there was a sharp decrease in the new installed footage of fibre conduit. The following table shows that during the 6-year period 1934–1939, 12,506,438 feet of conduit of all types was installed in the Greater New York City area, of which 1,772,360 feet was fibre conduit, and 10,734,078 feet was other than fibre conduit, i.e., chiefly concrete conduit.

| Year | Fibre conduit | Other than fibre including concrete conduit |
|------|--------------|---------------------------------------------|
| | *Feet* | *Feet* |
| 1934 | 364,413 | 1,863,149 |
| 1935 | 343,221 | 1,974,683 |
| 1936 | 480,230 | 1,839,734 |
| 1937 | 265,963 | 1,447,721 |
| 1938 | 176,442 | 1,534,288 |
| 1939 | 133,091 | 2,074,403 |
| | 1,772,360 | 10,734,078 |

At some time in the years 1932–1934, Consolidated Edison stopped purchasing conduit from petitioner; thereby petitioner lost a substantial customer.

The following table shows for the years 1922 through 1939 the feet of fibre conduit installed in each year in the entire Consolidated Edison area; and for the years 1931 through 1939, the feet of conduit made of a material, or materials, other than fibre, which was installed in the same area. The figures set forth above are taken from the following complete table of figures. The conduit made of a material other than fibre chiefly was precast concrete. During the 9-year period 1931–1939, 28,010,320 feet of conduit was installed, of which 17,482,407 feet was made of the other-than-fibre material, and 10,527,913 feet was fibre conduit.

CONSOLIDATED EDISON PURCHASES OF CONDUIT (FEET)

| Year | Fibre conduit | Conduit made of material other than fibre [1] | Both types |
|---|---|---|---|
| 1922 | 1,317,540 | [2] | [2] |
| 1923 | 2,425,326 | [2] | [2] |
| 1924 | 2,019,633 | [2] | [2] |
| 1925 | 1,480,571 | [2] | [2] |
| 1926 | 1,763,558 | [2] | [2] |
| 1927 | 2,478,059 | [2] | [2] |
| 1928 | 1,056,424 | [2] | [2] |
| 1929 | 7,007,175 | [2] | [2] |
| 1930 | 6,998,143 | [2] | [2] |
| Subtotal | 26,546,429 | [2] | [2] |
| 1931 | 4,682,118 | 2,044,579 | 6,726,697 |
| 1932 | 3,252,206 | 2,882,687 | 6,134,893 |
| 1933 | 821,229 | 1,821,063 | 2,642,292 |
| 1934 | 364,413 | 1,863,149 | 2,227,562 |
| 1935 | 343,221 | 1,974,683 | 2,317,904 |
| 1936 | 489,230 | 1,839,734 | 2,328,964 |
| 1937 | 265,963 | 1,447,821 | 1,713,684 |
| 1938 | 176,442 | 1,534,288 | 1,710,730 |
| 1939 | 133,091 | 2,074,403 | 2,207,494 |
| Subtotal | 10,527,913 | 17,482,407 | 28,010,320 |
| Total | 37,074,342 | | |

[1] Chiefly square, precast concrete conduit.
[2] Not available.

The reason for the decline in the purchases in the Consolidated Edison area of fibre conduit during the years 1934–1939 was the decision of the purchasers to buy more of a new type of underground conduit, the precast concrete conduit which was square on the outside, round inside, and was prepared for direct burial in the ground without any separate concrete encasement. The Consolidated Edison group found that precast, square, concrete conduit is easier to lay and install and is a satisfactory conduit, or duct, for electric cables. Consolidated Edison is still installing precast concrete conduit throughout its system.

The Concrete Conduit Corporation, operated by the O'Rourkes, at Corona, Long Island, makes the precast, square, concrete conduit. It began to produce concrete conduit for underground installation of electric cables in the early part of 1933 and it sold this conduit to Consolidated Edison. Another concern, Roman Stone Construction Company in Brooklyn, also sold concrete conduit to Consolidated Edison. They began making their conduit in 1935; they make conduit which is round on the outside as well as inside; it appears that they made square conduit, also.

Some of the fibre conduit which petitioner manufactured during the 1920's was sold in Canada as well as in several other parts of the British Commonwealth through the Key Engineering Company. A Canadian corporation commenced the manufacture of fibre conduit about 1930 or 1931 and within a short time thereafter petitioner entered into certain contractual arrangements pursuant to which it

withdrew from its former Canadian and British markets in consideration of receiving certain fees or commissions based on the sales of the new Canadian producer. Commissions on the sales of the Canadian companies in the expanded territory were paid to petitioner, as follows:

| 1932 | $1, 014. 91 | 1936 | $3, 541. 91 |
|------|-------------|------|-------------|
| 1933 | 951. 50 | 1937 | 11, 903. 53 |
| 1934 | 3, 672. 53 | 1938 | 8, 031. 42 |
| 1935 | 4, 294. 13 | 1939 | 8, 545. 33 |

Petitioner sustained a loss of competitive position before and during the base period years which constituted an important adverse effect upon petitioner's sales of underground electric conduit before and during the base period years.

*Sales of conduit to industrial users.*—During the years material here, petitioner sold 10 percent, or less, of its conduit to a few industrial concerns, who were not electric utilities, for underground installation of electric cables. Such customers included Union Carbide, Youngstown Sheet and Tube, and a few telephone companies, and at La Guardia airfield.

## Electric Utility Industry.

Most of the underground facilities installed and constructed by electric utility concerns, including raceways for electric cable for which conduit material is used, are generally classified as distribution facilities rather than transmission facilities. The capital expenditures of electric utilities for the transmission and distribution of electric energy include expenditures for generating steam (a fuel), hydrogen pressure systems, transmission facilities, distribution facilities, general plant, and miscellaneous items. Such capital expenditures include the costs of new construction of the facilities involved in the transmission and distribution of electricity. The costs of constructing new distribution facilities include both rural and urban facilities. It is difficult to ascertain the breakdown of these large categories of capital expenditures for new facilities without going directly to the accounting records of individual electric utility companies. The statistics of trade organizations, such as the Edison Electric Institute, and of trade publications, such as the Electric World, do not provide analytical breakdowns of the broad classes of capital expenditures of the types described above, and the record here does not contain such breakdowns.

The general statistical data which the parties were able to submit at the trial of this case do not show on an industry-wide basis the

annual expenditures of the electric utility industry as a whole for conduit for underground cable installations in either distribution or transmission facilities.

It is generally understood that the cost of the conduit itself for installation as raceways for underground electric cable is a relatively small part of the total cost of installing new electric cable conduit; and that, also, the cost of the conduit itself is even a smaller proportionate part and amount of the total cost of reconstructing electric energy distribution systems.

The capital expenditures of electric utility companies to which their expenditures for electric conduit are most closely related are the expenditures for distribution facilities. However, such expenditures must be adjusted to eliminate expenditures for overhead distribution costs, such as rural construction, in order to arrive at a fairly accurate ratio of the sales of conduit by conduit manufacturers to the capital expenditures of electric utilities for distribution facilities. The record in this case does not include any satisfactory evidence of such ratio, or ratios.

The following schedule discloses the degree to which electric light and power companies owned by private investors were expanding electric service into the rural or farm areas of the United States over the period 1925 to 1939, inclusive. Investor-owned public utility companies accounted for substantially all of the increase in the number of farms served up through at least the year 1933. The Tennessee Valley Authority Act of 1933 was enacted on May 18, 1933 (ch. 42, 48 Stat. 58); the Rural Electrification Administration was established by Executive Order No. 7037 on May 11, 1935 (ch. 432, sec. 8, 49 Stat. 1363), and the related amendments to the Federal Power Act were enacted on August 26, 1935 (ch. 687, title II, 49 Stat. 838):

| End of year | Farms served by investor-owned electric companies | Increase over prior years | Percentage increase over prior years |
|---|---|---|---|
| | | | *Percent* |
| 1924 | 204,780 | (1) | |
| 1925 | (1) | 46,800 | 22.85 |
| 1926 | 309,125 | 57,545 | 22.87 |
| 1927 | (1) | 86,455 | 27.97 |
| 1928 | 506,250 | 110,670 | 27.98 |
| 1929 | 576,150 | 69,900 | 13.81 |
| 1930 | 649,900 | 73,750 | 12.80 |
| 1931 | 698,800 | 48,900 | 7.52 |
| 1932 | 709,450 | 10,650 | 1.52 |
| 1933 | 713,550 | 4,100 | .58 |
| 1934 | 743,950 | 30,400 | 4.26 |
| 1935 | 788,800 | 44,850 | 6.03 |
| 1936 | 976,350 | 187,550 | 23.78 |
| 1937 | 1,093,400 | 117,050 | 11.99 |
| 1938 | 1,174,500 | 81,100 | 7.42 |
| 1939 | 1,348,500 | 174,000 | 14.81 |

[1] Not available.

The privately owned electric light and power companies were expanding their distribution lines in rural areas at a rather rapid rate throughout most of the 1920's. The rate of expansion then fell off rather sharply at the time of the general business depression in the early 1930's and continued to be at a fairly low level until about 1934. Expansion of such service was thereafter resumed at a relatively rapid pace which was more or less comparable during the base period years to that previously maintained during the 1920's.

Expenditures for the construction of distribution lines to serve farm areas represented a relatively small part of the total construction expenditures of privately owned electric utility companies. In many cases throughout the years 1922–1939, inclusive, the privately owned light and power companies required new customers in rural areas to put up at least part of the cost of constructing the distribution lines necessary to provide them with electric service.

The total cost of all the rural distribution lines constructed by the privately owned light and power companies during the base period years probably did not exceed the following amounts:

| Year | Amount (in thousands) |
|---|---|
| 1936 | $34, 549 |
| 1937 | 34, 004 |
| 1938 | 93, 044 |
| 1939 | 83, 453 |

There was a great deal of initial adverse reaction on the part of private industry during the early part of the 1930's to the inauguration of the TVA and REA programs and the passage of the Public Utility Holding Company Act of August 26, 1935, which began to be put into effect by those in control of the Federal Government about that time. Certain persons who were closely associated with the electric utility companies owned or controlled by private investors expressed considerable concern about the possibility that important segments of the public utility industry in this country would be placed under public ownership and control. The persons expressing such concern regarded such programs, legislation, and related projects as socialistic and attempted to discourage any expansion thereof. This initial adverse reaction had some effect on the expansion programs of the privately owned public utility companies operating primarily in rural territories as hereinabove noted but did not operate to hold down total expenditures for the construction of new distribution facilities to any substantial degree after about 1936 or 1937 and had no substantial adverse effect at any time on the quality or amount of electric service being rendered to customers for electricity over the country as a whole.

The new construction expenditures of the public utility industry totaled approximately $3.9 billions from 1929 to 1939 when electric

utility output increased by approximately 33 billion kilowatt hours, or at about the same rate as the period from 1924 to 1929 when new construction expenditures were just under $4 billion and electric utility output increased by 36 billion kilowatt hours.

Most of the public utility companies serving the larger and older metropolitan centers which had a substantial need for underground electrical distribution cables in their congested downtown business sections had pretty well accomplished the installation of complete systems of underground conduit lines throughout such sections by about 1930 or 1931 and the electric light and power industry as a whole has never had any subsequent need to install underground conduit at the comparatively rapid rate which obtained during most of the 1920's.

The Public Service Electric and Gas Company of Newark, New Jersey, which is a privatey owned public utility company providing electric service over the most highly industrialized and heavily populated part of New Jersey, made very substantial installations of underground conduit during the years 1922 to 1939, inclusive. This company, whose experience in this respect was generally typical of other electric utility companies operating in similar territories, increased the physical quantity of its underground cable installations by approximately 80 percent over the 6-year period from December 31, 1925, to December 31, 1931, and also increased its total footage of underground conduit lines by a little better than 55 percent during this same 6-year period. The net aggregate increase in its underground cable installations over the next succeeding 8-year period ending December 31, 1939, amounted to only about 19½ percent, while the net increase in its underground conduit lines for this same 8-year period was only about 15 percent.

A major portion of the underground fibre conduit used by electric light and power companies in the construction of underground raceways for electric power cables up through about 1937 was encased in a concrete envelope in such a way as to separate the individual duct lines from each other and to provide a protection from external pressure. Several parallel conduit lines were commonly installed by the light and power companies at one time in groups of 6, 8, 12, or larger numbers in a single bank. The primary purpose of using conduits for the installation of underground cable is to permit of flexibility of the distribution of the electricity through the addition of more cables or by the substitution of new cables of larger size, more modern design, or higher voltage as the electric powerload increases.

It was the general practice of the electric light and power companies to anticipate their needs for underground duct for a substantial number of years in the future so that they would not have to dig

up streets and incur the other expenses necessary to install additional banks of conduit to serve the same physical territory.

The following table, for 1922 through 1939, shows total construction expenditures by the electric light and power industry (in thousands of dollars) for distribution facilities, for distribution plants, and the percentage ratio of petitioner's sales of conduit to distribution plant expenditures:

| Year | Total construction expenditures for distribution facilities [1] | Total construction expenditures for distribution plants | Percentage ratio of petitioner's conduit sales to distribution plant expenditures |
|---|---|---|---|
| | *Thousands of dollars* | *Thousands of dollars* | *Percent* |
| 1922 | 84, 095 | 127, 700 | 0. 94 |
| 1923 | 193, 130 | 263, 000 | . 81 |
| 1924 | 179, 010 | 255, 000 | . 74 |
| 1925 | 221, 000 | 297, 700 | . 40 |
| 1926 | 206, 000 | 214, 790 | . 70 |
| 1927 | 220, 000 | 301, 980 | . 54 |
| 1928 | 212, 000 | 268, 400 | . 64 |
| 1929 | 261, 000 | 320, 020 | . 65 |
| 1930 | 258, 699 | 354, 600 | . 56 |
| 1931 | 182, 158 | 239, 440 | . 46 |
| 1932 | 110, 000 | 157, 200 | . 39 |
| 1933 | 72, 200 | 102, 900 | . 37 |
| 1934 | 76, 299 | 106, 760 | . 35 |
| 1935 | 103, 104 | 146, 660 | . 24 |
| 1936 | 174, 640 | 256, 650 | . 21 |
| 1937 | 203, 250 | 312, 020 | . 21 |
| 1938 | 215, 000 | 272, 900 | . 16 |
| 1939 | 210, 500 | 320, 070 | . 16 |
| Total | 3, 182, 085 | 4, 317, 790 | |

[1] Exclusive of substations.

COLUMN II (*In thousands of dollars*)

| | |
|---|---|
| Total expenditures for 18 years | $3, 182, 085 |
| Total expenditures for 1936–1939 | 803, 390 |
| Average for 18 years | 176, 782. 50 |
| Average for 4 years | 200, 847. 50 |

The base period average expenditures represents 113.61 percent of the average expenditures of the 18-year, long-term average.

COLUMN III (*In thousands of dollars*)

| | |
|---|---|
| Total expenditures for 18 years | $4, 317, 790 |
| Total expenditures for 1936–1939 | 1, 161, 640 |
| Average for 18 years | 239, 877. 22 |
| Average for 4 years | 290, 410. 00 |

The base period average expenditures represents 121.07 percent of the average expenditures of the 18-year, long-term average.

The construction of underground cable lines by public utilities is expensive, the cost involved being from 10 to 50 times as much as the cost of installing overhead lines. As the result of the cost factor, the use of underground lines for the transmission or distribution of elec-

tricity in areas away from cities cannot be justified from an economic or engineering standpoint.

Beginning about 1924 or 1925, most of the larger electric utility companies operating in the older and more heavily populated or industrialized areas began to feel the effect of a rapid increase in the consumption of electricity in the form of congestion in the downtown areas of the municipalities which they served. This point of time also represented the beginning of a general movement on the part of the governing boards of the municipalities concerned to require the power companies to convert overhead lines to underground lines in the downtown areas. Such municipal pressure resulted in the installation of a great many underground conduit lines during the 1920's which were not justifiable from an economic or engineering standpoint.

Once a major complete underground system for the distribution of electricity has been established in a municipality, the further need for additional underground cable and underground conduit in which to install such cable is bound to be much less. The advance planning mentioned above was ordinarily so well done during the 1920's that very few of the underground conduit lines installed at that time have ever had to be reinforced.

There were a number of technological changes affecting the operations of public light and power companies during the late 1920's, which had the effect of extending the period for which the existing underground conduits in place as of the close of such decade could take care of an increased demand for electricity over a very long period of time. These technological changes included improved developments in the manufacture of underground cable which permitted cable of the same external size to contain much larger copper conductors. Another important technological change closely associated with the development of improved cable was the use of increased voltages for the transfer of electrical current. An increase in the voltage of current sharply increases the amount of current which can be delivered over a conductor of the same size in the same amount of time.

The voltages used for distribution of electricity under a direct current system are much lower than the voltages which can be used under an alternating system and important utilities began to curtail or discontinue the expansion of direct current distribution systems during the 1920's. A considerable volume of underground cable which was initially installed for the distribution of direct current was taken out from underground conduit lines during 1943 and succeeding years. Such withdrawal of cable was primarily responsible for the fact that the total underground cable in use by all class A and class B public utilities under private ownership actually showed a substantial decrease between the end of 1943 and the end of 1949. Many of the public utility companies also changed from a two-phase to a three-

phase distribution system during the latter part of the 1920's or shortly thereafter and this change made it possible for the same amount of current to be delivered over a fewer number of wires.

The period from about 1924 or 1925 to 1930 or 1931 was one of abnormally high sales for the petitioner and other producers of underground conduit as the result of a combination of several different factors. This was a period when the power and light companies had ready access to ample funds for both the expansion and betterment of their facilities and proceeded to go forward with capital investment programs which in some instances cannot be explained on any basis other than as a characteristic at that time of the public utility holding company system which was then expanding very rapidly with the resultant payment of high returns to investors and much speculative interest in the market for public utility securities. Contemporaneous technological developments also resulted in numerous arrangements for the interchange of electric power between companies and between different parts of the distribution systems maintained by individual electric utility companies for the purpose of assuring customers essentially uninterrupted service. It was also a period of rapid increase in the demand for electricity by customers of light and power companies in the older metropolitan areas, which had largely been built up before the days of the automobile. There were numerous instances in the older metropolitan areas where the increase in the number of required overhead electric wires resulted in such congestion as to become uneconomic or unsightly. As a result, public pressure was exercised to have electric cables placed underground.

Individual electric utility companies make underground installations of conduit for electric cable at varying times and under differing conditions. Since petitioner's business is conducted on a nationwide basis, its receipts of orders for conduit tend to even out, or maintain a level, since its customers do not tend to engage in substantial underground conduit installations at the same time.

Under normal conditions, the life of installed conduit systems is so long that a high degree of permanence characterizes the conduit installations.

### Underfloor Duct Systems.

On November 30, 1921, petitioner secured its first license from the Richardson Syndicate for the production and sale of systems of underfloor duct or raceway systems made of fibre or metal and associated junction boxes and other metal fittings. The underfloor duct systems used are for installation of electric and telephone wire systems. The underfloor systems are designed for installation in the floors of large office, industrial, institutional, and public buildings;

they are designed to provide readily accessible outlets for electric and telephone wires. The systems are installed at the time the floors in a building are constructed, and, later, the occupants utilize the systems for telephone and electric service at any place in the building. Such service is readily accessible to each tenant through the underfloor duct system without cutting the floor. These systems are now widely used.

The original underfloor duct system was patented in about 1921 by a syndicate headed by Richardson, the inventor, and November 1921, petitioner obtained a license to manufacture and sell the system.

The method of selling such system is to deal with the architect and engineer for a new building so that the system is included in the specifications for the building. The system is subsequently bought and installed by the electrical contractor for the building.

During the first few years, petitioner made the ducts for underfloor systems by cutting into halves the 4-inch fibre conduits it manufactured. Such half portions were laid down, together with metal fittings, to form the desired partitions for a system. A concrete floor was poured over the system. In some instances raceway or ducts of smaller diameter were desired. In about 1927, petitioner purchased specially formed metal ducts with which metal fittings were used to form such partitions. By 1927 petitioner had learned how to deform its standard fibre conduit during manufacture so that one side was flat. From that time on, the deformed-type duct was used instead of the half portions of electric conduit which formerly were produced. By 1928 or 1929, petitioner had learned how to deform smaller sizes of duct so that the use of metal raceways for smaller diameters was discontinued. From 1929 on, no metal raceways were sold by petitioner for its underfloor systems.

All of the underfloor duct systems which petitioner manufactured and sold during the early 1920's were a type called "afterset," which meant that outlets would be provided as needed, from time to time, after the initial installation by boring through the concrete floor and the top surface of the duct imbedded therein. Petitioner subsequently began adding certain outlet fittings to the duct, prior to the initial installation thereof, so that access to the duct for the insertion or removal of wiring connections could be obtained at predetermined points merely by removing a cap, or plug, which had been "preset" at the surface of the floor. Most of the duct were made of petitioner's fibre-bituminous material; however, petitioner also sold some relatively small quantities of metal duct in connection with its underfloor duct systems for a period of 2 or 3 years commencing about 1927. Petitioner only manufactured the fibre duct; petitioner purchased all the metal and other items which were part of the underfloor duct systems.

Petitioner began to experience considerable competition about 1925 from another company which had commenced manufacturing and selling an underfloor duct system with preset inserts. The other company, hereinafter referred to as X Company, owned a patent covering its preset system, but petitioner nevertheless instituted litigation in about 1926 in an effort to obtain a court decision ruling that this competing system infringed the Richardson and Coggeshall patent. Petitioner had become the exclusive licensee under the terms of its agreement with the Richardson syndicate. This litigation was terminated in 1928 by a decision of the Court of Appeals for the Second Circuit which expressed doubt about the validity of the claims in suit. The court held that the preset system involved did not constitute an infringement. *Fibre Conduit Co.* v. *Bankamerica Corp.*, 21 F. 2d 756, modified and affirmed 27 F. 2d 708.

Within a short time after the termination of this litigation, X Company filed an infringement suit against a third company, the Y Company, which was then manufacturing and selling another preset type of underfloor duct system. The litigation was not pursued to judgment. X Company did not file any infringement suit against petitioner.

Certain contracts were executed in 1932 which avoided further litigation by requiring both petitioner and the Y Company to pay to the X Company percentage royalties on all of their underfloor duct sales. The license and royalty agreement between X Company and petitioner was dated July 30, 1932. After this contract had been in effect for 3 years, X Company, in accordance with one of the express terms thereof, gave petitioner a complete release from all claims for infringement arising with respect to petitioner's use of X Company's patents at any time prior to July 30, 1932.

The rate of the royalty which petitioner agreed to pay under the agreement of July 30, 1932, with respect to all preset underfloor systems which it sold ranged from 6½ percent (in case all of its sales were of preset systems) up to 25 percent, in case 25 percent or less of its total underfloor duct business involved preset systems. While petitioner continued to sell some afterset systems, the portion of its total underfloor duct business accounted for by preset systems became increasingly important from year to year after 1932. Substantially all of the underfloor duct systems manufactured by companies X and Y continued to be of the preset type.

The agreement of July 30, 1932, was continued in force until some time after the end of 1939. In addition to the royalty provisions referred to above, the agreement also contained a special provision which dealt with a division of the combined preset underfloor duct

system business enjoyed by petitioner and companies X and Y. The license agreement between the X Company and the Y Company also contained a similar special provision. In petitioner's agreement with the X Company, the provision was in part as follows:

It is the intent of the parties hereto that the Fibre Company [petitioner] shall have the privilege of doing a volume of pre-set underfloor duct business not to exceed * * * one-third of the aggregate pre-set underfloor duct business done * * *. To that end, it is agreed that if at the end of any quarterly period during the life of this agreement, the total value of the orders for pre-set apparatus taken by either of the parties hereto from the date of execution of said agreement shall exceed * * * one-third of the value of the total orders for pre-set apparatus taken in the said period by the parties hereto and the other licensee [Y Company] * * *, the party taking the excess orders shall be notified to that effect and shall be allowed three succeeding quarters in which to offset such excess by a corresponding deficiency. If such offsetting of an excess is not attained by the end of said third succeeding quarter, the party whose orders have been exceeded shall have the privilege of cancelling this agreement on thirty days' notice.

Johns-Manville was acting as sales agent for petitioner's underfloor duct systems, as well as for its underground fibre conduit, up until sometime in 1928. Petitioner then expanded its own sales organization with a view to handling all phases of the distribution of its underfloor duct systems and operated on this altered basis for a short time. On November 13, 1929, petitioner entered into an agreement with the General Electric Company pursuant to which it commenced making a special type of underfloor duct system for that corporation. This duct system bore a General Electric label. It soon began to account for most of petitioner's underfloor duct sales. Such arrangement with General Electric was continued in force throughout all the subsequent years material to this case.

Some of the petitioner's underfloor duct systems had been sold to Canadian customers from time to time up until about 1930 or 1931. Pursuant to the terms of a certain written contract dated April 1, 1931, petitioner transferred the title to some of its underfloor duct patterns (then located at Montreal) to Fibre Conduits Canada, Ltd. Petitioner agreed that future sales of underfloor duct systems would be handled by the Canadian corporation. Petitioner also agreed that it would furnish technical advice and otherwise assist the Canadian corporation in manufacturing an underfloor duct system in the latter's plant at Cornwall, Ontario, in exchange for certain commissions or fees to be determined on a percentage basis by reference to the total volume of sales of the Canadian company.

The Canadian company commenced the manufacture of underfloor duct for the first time in 1931. The foregoing arrangement and somewhat similar arrangement made by petitioner relating to its fibre conduit were later consolidated into a single contract dated April 21,

1938, under which the commissions to be paid to petitioner ranged from 4 percent down to 2 percent on all underground fibre conduit and underfloor duct systems sold in Canada and amounted to 10 percent on all such sales outside of Canada.

In about 1933, the Robertson cellular floor came on the market. It was made for use in office and other nonresidential buildings. A feature of this floor was that wires could be run through the cellular space thereby eliminating any underfloor duct system. Petitioner has failed to show the extent to which the Robertson floor did or did not compete with underfloor duct systems during the years 1933 through 1939.

The present record contains no information with respect to the amount of profits which were ever realized by any other producer of underfloor duct systems. The only statistical information available about the volume of sales of underfloor duct systems by the X Company is limited to its dollar sales for the years 1931–1939, inclusive. The corresponding statistics available for the Y Company are limited to the years 1935 to 1939, inclusive. The dollar sales of fibre underfloor duct systems during the years 1931 through 1939 by the X Company and the Y Company, were as follows:

SALES OF UNDERFLOOR DUCT SYSTEMS

| Year | X Company | Y Company | Year | X Company | Y Company |
|---|---|---|---|---|---|
| 1931 | $376,748 | | 1936 | $173,240 | $119,229 |
| 1932 | 253,932 | | 1937 | 231,401 | 175,129 |
| 1933 | 121,879 | | 1938 | 215,290 | 94,116 |
| 1934 | 159,956 | | 1939 | 270,174 | 206,063 |
| 1935 | 102,064 | $50,710 | | | |

During the years 1923–1939, inclusive, the dollar amounts of petitioner's sales of underfloor duct systems were as follows:

PETITIONER'S SALES OF UNDERFLOOR DUCT SYSTEMS

| Year | Feet (thousands) | Sales | Year | Feet (thousands) | Sales |
|---|---|---|---|---|---|
| 1923 | 19 | $43,378 | 1932 | 551 | $189,145 |
| 1924 | 110 | 32,358 | 1933 | 485 | 188,985 |
| 1925 | 327 | 63,727 | 1934 | 109 | 66,784 |
| 1926 | 244 | 155,683 | 1935 | 388 | 77,502 |
| 1927 | 576 | 233,289 | 1936 | 276 | 149,848 |
| 1928 | 821 | 500,482 | 1937 | 192 | 111,753 |
| 1929 | 924 | 359,672 | 1938 | 258 | 147,602 |
| 1930 | 1,348 | 506,762 | 1939 | 244 | 194,487 |
| 1931 | 296 | 160,525 | | | |

The United States Department of Commerce has compiled statistics showing the total dollar expenditures during the period 1920 through 1949 for the following types of buildings in the United States: (a) New private construction of warehouses, offices, and loft

buildings, and (b) new public construction of public administration buildings. The parties are agreed about the accuracy of this data. This statistical information appears in a Government publication released in May 1950 in two separate lengthy tables covering a wide variety of other categories classified as new private construction and new public construction, respectively. All of the dollar figures contained in the tables constitute estimates of the value of work in place on structures and facilities under construction or alteration from year to year, including estimated costs of the materials in place during a given year, regardless of the dates of purchase or delivery to site, plus labor costs, overhead costs, and profits on construction activities, all estimated on the same basis. The publication states that the reliability of these estimates cannot be measured in mathematical terms and that they are more likely to be understatements of the absolute level than otherwise.

The structures covered by the above-mentioned statistical series described as warehouses, offices, and loft buildings include substantially all types of commercial warehouses and storage buildings but do not include warehouses constructed by public utilities or any noncommercial buildings of this character such as are operated in connection with a wide variety of mechanical and processing industries. The loft buildings included in this category, which are peculiar to large cities, like New York, are structures of a special type generally used for light manufacturing operations and other related business activities, such as the storage and distribution of manufactured products, but no other buildings used for the production or assembly of products in either the light or heavy manufacturing industries are included in these statistics. Film exchanges, banks, and building and loan association buildings are included in the same category as office buildings but a wide variety of other important nonresidential structures, like office buildings constructed by public utilities, radio broadcasting studios, laboratories, and science buildings, are excluded.

The structures covered by the above-mentioned statistical data for public administration buildings include not only office buildings but a wide variety of special purpose buildings like courthouses and city halls, State capitols, armories, firehouses, comfort stations, zoo buildings, and various others. At the same time, however, the statistics do not include any kind of social, recreational, or religious buildings under private ownership. Such statistics exclude all educational buildings, all hospitals, clinics, and similar institutional buildings, whether publicly or privately owned, as well as all buildings falling within the general category of military and naval facilities.

The following schedule, for the years 1923–1939, inclusive, shows petitioner's dollar amounts of sales of underfloor duct systems, the

combined totals of selected construction expenditures of the kind described above, and the percentage ratio obtained from a division of petitioner's dollar sales of underfloor duct systems by the expenditures for selected types of construction:

| Year | Petitioner's sales of underfloor duct | Selected construction expenditures (millions) | Ratio of sales of petitioner to construction expenditures (percentages) |
|---|---|---|---|
| 1923 | $43,378 | $341 | 0.013 |
| 1924 | 32,358 | 336 | .010 |
| 1925 | 63,727 | 343 | .019 |
| 1926 | 155,683 | 413 | .038 |
| 1927 | 233,289 | 463 | .050 |
| 1928 | 500,482 | 493 | .010 |
| 1929 | 359,672 | 536 | .049 |
| 1930 | 506,762 | 728 | .070 |
| 1931 | 160,525 | 724 | .035 |
| 1932 | 189,145 | 459 | .063 |
| 1933 | 188,985 | 300 | .124 |
| 1934 | 66,784 | 153 | .044 |
| 1935 | 77,502 | 165 | .047 |
| 1936 | 149,848 | 272 | .055 |
| 1937 | 111,753 | 280 | .040 |
| 1938 | 147,602 | 260 | .057 |
| 1939 | 194,487 | 315 | .062 |

The following schedule covers the years 1922 to 1939, inclusive; it shows the total compiled receipts of all corporations, as published by the United States Treasury Department, and corresponding data for all corporations with respect to total compiled net profit (or loss), less tax-exempt income, plus interest paid, more commonly known as the Series C data set forth in Commissioner's Mimeograph 5807, 1945 C.B. 273:

| Year | Total compiled receipts | Total compiled net profit (or loss) per series C | Year | Total compiled receipts | Total compiled net profit (or loss) per series C |
|---|---|---|---|---|---|
| | (Millions) | (Millions) | | (Millions) | (Millions) |
| 1922 | $101,314 | $7,839 | 1931 | $108,057 | $1,204 |
| 1923 | 119,020 | 9,586 | 1932 | 81,638 | (1,600) |
| 1924 | 119,747 | 8,808 | 1933 | 84,234 | 964 |
| 1925 | 134,780 | 11,238 | 1934 | 101,490 | 3,516 |
| 1926 | 142,629 | 11,493 | 1935 | 114,650 | 4,957 |
| 1927 | 144,899 | 10,885 | 1936 | 132,723 | 7,451 |
| 1928 | 153,305 | 12,808 | 1937 | 142,443 | 7,410 |
| 1929 | 161,158 | 13,665 | 1938 | 120,454 | 4,479 |
| 1930 | 136,588 | 6,413 | 1939 | 132,878 | 7,306 |

A comparison of the dollar amounts of petitioner's sales of underfloor duct systems with statistical data for total selected construction expenditures, *supra*, and total compiled receipts of all corporations, *supra*, provides no indication that the underfloor duct portion of petitioner's business was subject to a profits cycle which differed materially in either length or amplitude from the general business cycle. The same conclusion is made upon the basis of the entire record in this case.

*Management, Operations, and Products.*

During 1935 and the early part of 1936, several officers of petitioner retired or died. In January 1925, the secretary-treasurer, F. J. Frost, retired from the office of secretary and was succeeded by F. G. Wehman. In April 1925, A. B. Bradley, vice president in charge of production and a director, died. In June 1925, George L. Chapman, a director, died. The president, A. M. Cregier, died in February 1936; he had been associated with petitioner for over 31 years. H. J. Robertson became president in 1936. Frost retired from the office of treasurer in 1936. Wehman then became the secretary-treasurer. Shortly after Robertson was made sales manager of the underfloor duct system in 1928, petitioner adopted his recommendation to stop selling the underfloor duct system through Johns-Manville, and to expand its own sales force for the direct distribution thereof. Subsequently, Robertson took an active part in negotiating the contract of November 13, 1929, with the General Electric Company, which resulted in a substantial curtailment of petitioner's newly recruited sales force. This contract contained an express provision to the effect that the sales organization maintained by General Electric would not only make sales of the "General Electric" underfloor system, but also would sell the other underfloor products manufactured by the petitioner for varying commissions, depending upon the extent to which petitioner's own salesmen were active in making sales. Robertson was elected to petitioner's board of directors in 1931. Also, Robertson played a major role in the negotiation of several important contracts, during the period up to 1936, to which petitioner was a party. These contracts were, *inter alia*, the new sales agency agreement with Graybar Electric Company dated May 1, 1934, and the contracts involving petitioner's agreements to withdraw from British and Canadian markets, already mentioned. In 1936, Robertson appointed B. G. Le Mieux to the post of director of research. Le Mieux, an engineer, was chiefly responsible for developing the vacuum treating system referred to hereinafter. Le Mieux had been a member of petitioner's research staff since about 1932.

*The vacuum treating process.*—The manufacture of tubes made of a pulp-bituminous compound goes through the steps of forming and drying white tubes made of pulp material and, then, saturating and impregnating the tubes with a hot compound of tar pitch. The latter step is called the treating process. The purpose is to thoroughly incorporate the pitch into and throughout the tubes. The strength of the walls of the tubes and the degree of their resistance to absorption of water depends on the effectiveness of the treating process. For many years petitioner's method of treating the fibre tubes was to

submerge them in the tar compound in open tanks. This is the open-tank treating process; it requires from 8 to 12 hours. At some time in the early 1930's, before 1933, an engineer employed by petitioner Le Mieux, worked on ways of improving the treating process and through his efforts petitioner adopted a vacuum process. The vacuum process involves removing all air from sealed treating tanks in which the white tubes have been placed and injecting the pitch compound into the vacuum chamber. The equipment required includes vacuum pumps, pitch pumps, pitch lines, and automatic control instruments. The vacuum method of incorporating pitch compound into fibre material is superior to the open-tank treating system because the treating time required is reduced from 8 or 12 hours to about 1 hour for thin-wall tubes. The resulting material is stronger and has a higher degree of resistance to water absorption. For heavy-wall tubes the vacuum treating process requires several hours but less time, nevertheless, than the open-tank method. Also, under the vacuum method a better type of tar pitch could be used. Petitioner developed an improved hard coal tar pitch at about the same time that it developed and adopted the vacuum treating process.

At a meeting of the executive committee of petitioner's board of directors on January 17, 1933, the president of petitioner, Cregier, presented a 5-page report to the committee which dealt with, among other things, tests which had been made of the material used by petitioner and its competitors in the making of the basic fibre material. Cregier reported that with respect to qualities of strength and water absorption petitioner's basic material was not superior to its competitors' material; and that it was believed that petitioner's open-tank treating method was not as effective, as the treating methods of the competitors. In the minutes of a meeting on September 19, 1933, of either the directors of petitioner or the executive committee of the directors, it is shown that as of that date petitioner had in operation in its plant the vacuum treating process, described above, as a so-called "pilot operation." Prior to September 19, 1933, the first experiments with a vacuum treating process were carried on at petitioner's laboratories with a small unit; next, a larger unit was built which could be used as a production unit. By September 19, 1933, petitioner had started its "pilot" production unit of the vacuum treating process. This was a production unit which was larger than a testing unit. As of the aforesaid date petitioner was actually using the vacuum treating process in its manufacturing but it had not yet converted all of its production facilities to the vacuum treating process.

On October 17, 1933, at a meeting of petitioner's board of directors, Cregier reported that the vacuum treating process was satisfactory with the exception of some minor changes which would be made. At this same meeting in October 1933, there was discussion about the matter of re-treating all of the finished conduit in stock, and the cost of so doing was estimated to be about $30,000; the cost of re-treating part of the goods on hand, in the most commonly used sizes, was estimated to be $15,000. It was the opinion of the board that only the most commonly used sizes of tubes in stock should be re-treated under the new vacuum treating process.

In October 1933, the vacuum treating process which was in use in petitioner's plant was adequate to take care of the treating of one-third of petitioner's total manufacturing capacity, or all of it if the plant was being operated at one-third of the total capacity. In October 1933, the plant was being operated at about one-third of its total capacity. Subsequently, petitioner ripped out all of its open-tank treating system and made the required expenditures to install additional vacuum treating facilities which would take care of petitioner's total maximum production capacity.

The vacuum treating process was adopted by petitioner in 1933, and in 1933 it was in operation in petitioner's plant and was used in the manufacturing process.

One result of adopting the vacuum treating process was that petitioner was able to reduce the wall thickness of its standard fibre pipe, sold for use as conduit. The reduced wall tubes were also called "thin wall." Also, petitioner was able to reduce the price of its thin-wall, standard conduit, or pipe.

### Joints.

The only type of joint initially provided for petitioner's underground conduit involved tooling the ends of the conduit to fit together in a mortise and tenon fashion. Such joints were called socket joints and petitioner continued to sell conduit with this type of joint well into the 1930's. In the meantime, in 1929, it developed a sleeve type of joint known as the Harrington Joint, which made use of tapers on the ends of the conduit and a separate outside collar permitting two sections of conduit to be joined and held together by friction. After other manufacturers entered the field, they agreed with the petitioner on certain standard specifications for underground conduit which were made effective as of 1929. Control of dimensions and mechanical characteristics became increasingly more exacting thereafter. One of the purposes of this agreement upon uniform

specifications was to make the products of all three parties to such agreement readily interchangeable. Petitioner was able to comply with the new industry specifications with respect to joint sizes by retooling any conduit which it had on hand that did not meet such specifications, but it also wrote off a small portion of its existing inventory as obsolete.

*Products.*—Petitioner also carried on various other research activities during the early 1930's for the purpose of the possible development of new products. Some of this work proved to be unsuccessful. One such research project, which began as early as 1933 and was continued until July 1937, involved an effort to develop an underground conduit (strong enough to permit direct burial without concrete encasement) from a nonflammable, inorganic compound known as Rostone. The research with Rostone also envisioned the development of a segmentized or multiple-type conduit which could be sold for use in the construction of underground raceways for telephone lines in place of the clay tile products which were generally used for that purpose, to the nearly complete exclusion of fibre conduit.

Within a short time after petitioner began using the vacuum process, and after it started marketing an underground conduit with a thinner wall, it began making special efforts to find new uses and markets outside the electric utility field for its product with a wall thickness comparable to that of the tube which formerly was sold as standard conduit. Sometime during 1936, petitioner succeeded in interesting a number of oil companies in making trial uses of this heavier wall product for piping salt water away from oil fields. The product is fibre pipe. Later, in about July 1940, it was given the trade name, Alkacid, to describe the product used for drainage in oil fields. In the latter part of 1937, petitioner sold 15,000 feet of this pipe to Gulf Oil Company for use in the drainage of salt water found in oil fields.

Petitioner issued a new price schedule, effective October 1, 1937, which used the term, HW, or heavy wall, to identify the type of product which it was then offering for use outside the electric industry. The price schedule made it clear that the similar product with a thinner wall was at that time considered petitioner's standard electric conduit, Type I. The unit prices quoted in the schedule for the new standard conduit were approximately 13 percent lower than the unit prices quoted for the HW conduit which later came to be known as Alkacid.

Petitioner surveyed the possibility of finding a market for its heavy-wall product for use as sewer pipe, and certain trial installations were made prior to the end of 1939. Some were unsuccessful. Peti-

tioner did not commence an active campaign to get into the sewer pipe market until about 1943, when it made arrangements to have the Crane Company serve as a distributor of its heavy-wall product, and it also began to take active steps to have the use of this product approved in municipal ordinances, plumbing codes, and the like, for use as sewer pipe. It was not until 1943 that this product was designated sewer pipe.

Petitioner began negotiating with Sears, Roebuck and Company in 1936 for the possible sale of a perforated pipe, with a wall thickness comparable to its thinner walled conduit, for use as draintile, or drainpipe. These negotiations resulted in an arrangement in the latter part of 1937 with Sears to handle draintile in about 500 of Sears' retail stores and to list it in their mail-order catalogs. Such arrangement was reported to petitioner's directors on October 19, 1937. The name given to the draintile was "Hercules." The report made to the board at that time stated that petitioner's gross profit margin on such business would be considerably less than on other lines and that the drainpipe would be sold in competition with clay draintile selling at about half the price of fibre drainpipe.

Sometime around the end of the year 1937, petitioner commenced manufacturing an extra heavy-wall conduit called Nocrete. This product could be buried directly in the ground without a concrete encasement in the construction of underground raceways for electric cables. It was sold through the same trade channels which petitioner was then using for its standard conduit. Except for the above-mentioned special arrangement with Sears, these same channels, Graybar and General Electric Supply, were the only trade channels which petitioner ever used during the base period for either drainpipe or the heavy-wall conduit which later came to be known as Alkacid.

The following table shows for the years 1937–1939 and the excess profits years 1940–1942, the total dollar amounts of petitioner's sales of products other than underground conduit and underfloor duct, namely, Alkacid (sewer pipe), perforated drainpipe (also called draintile), and specialties; and, also, petitioner's sales of its heavy-wall, Type II, underground conduit, designated Nocrete:

PETITIONER'S SALES OF PARTICULAR PRODUCTS, 1937–1942

| Year | Nocrete | Alkacid (sewer pipe) | Perforated drain pipe | Specialties |
|---|---|---|---|---|
| 1937 | $1,116 | $1,740 | ---- | $17,595 |
| 1938 | 86,846 | 22,005 | $24,817 | 11,279 |
| 1939 | 92,599 | 42,993 | 27,737 | 6,123 |
| 1940 | 122,458 | 40,901 | 29,451 | 9,464 |
| 1941 | 217,847 | 47,074 | 59,037 | 6,275 |
| 1942 | 383,962 | 66,799 | 10,715 | 4,641 |

The following schedule shows petitioner's monthly sales during 1938 and 1939, in thousands of feet and dollar amounts, of Nocrete, Alkacid (sewer pipe), and perforated drainpipe (also called draintile):

| | Nocrete | | Alkacid (sewer pipe) | | Perforated drainpipe | |
|---|---|---|---|---|---|---|
| | Thousands of feet | Dollars | Thousands of feet | Dollars | Thousands of feet | Dollars |
| **1938** | | | | | | |
| February | 0 | 0 | 25 | (Monthly figures not known.) | 15 | $1,377 |
| March | 21 | $2,283 | 35 | | 50 | 3,871 |
| April | 24 | 3,309 | 58 | | 54 | 4,475 |
| May | 90 | 10,785 | 27 | | 21 | 1,149 |
| June | 94 | 11,177 | 33 | | 19 | 1,607 |
| July | 74 | 9,532 | 36 | | 8 | 913 |
| August | 61 | 10,131 | 83 | | 37 | 2,769 |
| September | 87 | 12,550 | 14 | | 15 | 1,015 |
| October | 60 | 7,934 | 41 | | 47 | 3,626 |
| November | 111 | 17,362 | 45 | | 50 | 3,642 |
| December | 9 | 1,783 | 54 | | 4 | 373 |
| | 631 | 86,846 | 451 | $22,005 | 320 | 24,817 |
| **1939** | | | | | | |
| January | 110 | $14,381 | 33 | $1,545 | 12 | $1,180 |
| February | 106 | 13,088 | 51 | 2,297 | 12 | 1,168 |
| March | 49 | 6,555 | 52 | 1,923 | 12 | 1,167 |
| April | 51 | 7,110 | 32 | 2,373 | 60.5 | 4,785 |
| May | 31 | 4,692 | 27 | 2,153 | 31 | 2,398 |
| June | 119 | 19,080 | 15 | 1,131 | 59 | 4,248 |
| July | 50 | 6,408 | ---- | ---- | 15 | 1,365 |
| August | 39 | 5,900 | 13 | 526 | 51 | 3,911 |
| September | 23 | 3,479 | 49 | 10,409 | 31 | 2,551 |
| October | 37 | 5,520 | 17 | 3,012 | 51 | 3,130 |
| November | 32 | 4,116 | 54 | 14,670 | 5.5 | 602 |
| December | 12 | 2,270 | 26 | 2,954 | 16 | 1,232 |
| | 659 | 92,599 | 369 | 42,993 | 356 | 27,737 |

Allocation of total production in feet to particular products during the years 1922 through 1939 is as follows, in thousands of feet:

NET SALES OF PRODUCTS

(Thousands)

| Year | Conduit | Floor duct | Nocrete | Alkacid | Perforated pipe | Total |
|---|---|---|---|---|---|---|
| 1922 | 12,836 | 0 | | | | 12,836 |
| 1923 | 20,811 | 19 | | | | 20,830 |
| 1924 | 17,810 | 110 | | | | 17,920 |
| 1925 | 11,209 | 327 | | | | 11,536 |
| 1926 | 14,039 | 244 | | | | 14,283 |
| 1927 | 15,548 | 576 | | | | 16,124 |
| 1928 | 16,099 | 821 | | | | 16,920 |
| 1929 | 19,188 | 924 | | | | 20,112 |
| 1930 | 17,321 | 1,348 | | | | 18,669 |
| 1931 | 9,896 | 296 | | | | 10,192 |
| 1932 | 5,688 | 551 | | | | 6,239 |
| 1933 | 3,609 | 485 | | | | 4,094 |
| 1934 | 3,562 | 109 | | | | 3,671 |
| 1935 | 3,331 | 388 | | | | 3,719 |
| 1936 | 5,251 | 276 | | | | 5,527 |
| 1937 | 6,187 | 192 | 7 | 15 | | 6,401 |
| 1938 | 3,801 | 258 | 631 | 451 | 320 | 5,461 |
| 1939 | 5,042 | 344 | 659 | 369 | 356 | 6,770 |

The averages of net sales in thousands of feet for all products, conduit, and underfloor duct systems for the years 1922–1939 (conduit), and the years 1923–1939 (duct), and the ratios of sales in the base period to sales in the entire period (in feet) are as follows:

| Years | All products | Conduit | Years | All products | Floor duct |
|-------|-------------|---------|-------|-------------|-----------|
| 1922–1939 | 11,184 | 10,624 | 1923–1939 | 11,184 | 428 |
| 1936–1939 | 6,040 | 5,070 | 1936–1939 | 6,040 | 268 |
| Ratio | 54.0 | 47.7 | Ratio | 54.0 | 62.6 |

In 1938, petitioner experienced losses on the freight charges on shipments west of the Mississippi and to the west coast. Current increases in freight charges could not be taken care of at the time by including them in selling prices. In the latter part of 1939, petitioner's directors were advised about electric utility concerns that were not placing their orders for conduit with the petitioner.

Petitioner did not develop and adopt the vacuum treating process during or immediately prior to the base period years. That process was in operation in 1933 to a not insubstantial extent.

There was not a substantial change in the management or operation of petitioner's business or a change in its capacity for production during or immediately prior to the base period.

Petitioner would not have achieved a substantially higher level of sales of Nocrete, Alkacid, or perforated drainpipe, or a substantially higher level of earnings, if it had commenced the sales of these products 2 years earlier than actually was done.

*Applications for excess profits tax relief.*—Petitioner filed timely applications (Forms 991 and 843) for excess profits tax relief under section 722 for the years 1940, 1941, and 1942, and it made claims for the benefits of carryovers and carrybacks of any unusued constructive excess profits credit with respect to the years 1940 through 1944. In its original applications petitioner claimed constructive average base period net income in the amount of $489,172 for 1940, and $611,809 for 1941 and the following years; and for constructive excess profits tax credits of $464,713 for 1940, and $581,219 for 1941 and the following years.

ULTIMATE FINDINGS.

The electric conduit business of the petitioner was not depressed in the base period because of temporary and unusual economic circumstances; or because an industry of which petitioner is a member was depressed by reason of temporary and unusual economic events; or by reason of conditions generally prevailing in an industry of which petitioner is a member, which subjected petitioner's manufacture and sale of electric conduit to sporadic and intermittent periods

of high production and profits. The present record does not establish that petitioner's electric conduit business was subjected to sporadic and intermittent periods of high production and profits which were inadequately represented in the base period.

Petitioner's underfloor duct business was not depressed in the base period because of conditions generally prevailing in its industry subjecting petitioner to a profits cycle differing materially in length and amplitude from the general business cycle.

Petitioner did not, either during or immediately prior to the base period years, change the character of its business.

The petitioner's business was not affected by any other factor, or statutory circumstance or event falling within the scope of section 722(b)(2), (b)(3)(A), (b)(3)(B), (b)(4), or (b)(5), which caused petitioner's average base period net income as determined without the benefit of section 722 for the years 1940, 1941, 1942, or 1944, to be an inadequate standard of normal earnings.

The present record does not establish that a fair and just amount representing petitioner's normal earnings to be used as a constructive average base period net income would result in a higher excess profits credit for any of the taxable years 1940 to 1944, inclusive, than the corresponding excess profits credit which has been determined on the basis of petitioner's statutory average base period net income for such year.

### OPINION.

The petitioner contends that its sales of electric conduit were depressed throughout the base period because of temporary and unusual economic circumstances or events within the meaning of section 722(b)(2). As an alternative ground for relief with respect to the electric conduit segment of its business, petitioner contends that its sales of conduit were depressed by reason of conditions subjecting it to sporadic and intermittent periods of high production and profits, that such periods were inadequately represented in the base period and, therefore, it qualifies for relief under subsection (b)(3)(B).

With respect to the underfloor duct segment of its business, petitioner contends that its profits from the sale of duct systems were depressed during the base period by reason of being subject to a variant profits cycle within the meaning of subsection (b)(3)(A).

Petitioner also contends that it changed the character of its business immediately before and during the base period. In this connection it claims that such change in the character of its business, within the meaning of subsection (b)(4), consisted of a change in management, the introduction of new products into new markets, a change in production operations, and an increase in its capacity for

production. The allegedly new products are Nocrete, Alkacid, and perforated drainpipe.

As an alternative to petitioner's claims for relief as set forth above, petitioner contends that it qualifies for relief under (b)(5).

The overall position of the petitioner is that multiple bases for relief exist. Accordingly, it has submitted computations of constructive average base period sales in terms of footage of electric conduit, underfloor duct systems, and new products and, on the basis thereof, a single reconstruction of base period net income. Bulletin on Section 722, pt. VIII (A)(1) (p. 144). It contends that a fair and just amount to be used as a constructive average base period net income (CABPNI), in lieu of the average base period net income determined under the growth formula provisions of section 713(f), is either $599,000, or $565,000, in the alternative, for the excess profits tax taxable years 1941 and 1942, as well as for the excess profits tax taxable years 1943–1944. The years subsequent to the taxable years in issue also have to be considered in connection with the reconstruction issue because of petitioner's claim of the right to the benefit of carrybacks from such subsequent years of unused constructive excess profits credit.

For the excess profits tax taxable year 1940, the petitioner has submitted a constructive average base period net income for use in computing the 1940 excess profits tax liability of either $317,340 or, in the alternative, $313,240. For the purpose of a claimed carryover from 1940 of unused constructive excess profits credit, the petitioner's reconstruction of CABPNI for 1940 is $387,000. The variable credit rule is applicable in a determination of a CABPNI for 1940 in respect to the reconstruction of the allegedly new products. Regs. 112, sec. 35.722–3(d), par. 15; Bulletin on Section 722, pt. V, subpt. II, (F)(1) and (2) (pp. 120–1). The difference between the respective amounts of the CABPNI for the years 1941–1944 and for 1940 is due to the deduction of constructive income taxes in computing the CABPNI for 1940 as well as an application of the variable credit rule.

Respondent contends that petitioner has failed to prove that it qualifies for relief under any provision of section 722(b), and that in any event petitioner's reconstructions of average base period net income should not be approved.

The record shows for each year in the period 1922 through 1939 (1) the respective total amounts of petitioner's sales of all products, less returns and adjustments; (2) gross profit from total sales of all products; and (3) net income or loss, after deductions, for the overall business. The record also shows a breakdown of sales into the respective dollar amounts and footage of the sales each year of underground electric conduit, underfloor duct systems, Nocrete, Alkacid

(sewer pipe), and perforated drainpipe. But petitioner has not presented a breakdown of total gross profit so as to show the dollar amounts of annual profit realized from the sales of each type of product, and there is no breakdown of dollar amounts of net income per product, either. Petitioner's system of accounting did not segregate dollar amounts and footage of annual sales and net profit for each class of products. Its explanation is that such segregation was unnecessary because all of its products are made of the same materials, under the same processes. The only separate account, which was not set up until 1937, is for "specialties" (fuse tubes, third-rail covers, cable troughs, and similar items). Furthermore, the profit and loss statements were not maintained on a consistent basis throughout 1922–1939.

For the purpose of its claims for excess profits tax relief, petitioner developed a series of schedules reflecting a separation of its total net sales in both feet and dollars into different classes of products on the basis of various kinds of records including summary shipment records and pricelists. It also worked out a series of statistical schedules, or analyses, relating to the same subjects. Respondent objects to all of these schedules, to the many assumptions involved, and to many adjustments of figures. In considering the issues, we have regarded respondent's objections to some of petitioner's adjustments of the dollar amounts of sales of certain products as valid. In view of our conclusions with respect to the questions relating to whether petitioner has shown that it qualifies for relief, we do not reach a series of respondent's objections to other adjustments of excess profits net income for various years in the 1922–1939 period. Those objections involve a group of questions which we conclude are not necessary to decide.

Petitioner has presented a schedule purporting to show profit per foot of sales of all products for each year. However, it has not carried out such analysis on the basis of allocating total profit on its reconstructed footages of sales of all products to profit per foot of sales of each product. The record, therefore, does not present any means for determining annual profit realized from the sales of each product in each year during all or part of the long period, 1922 through 1939. In this situation, petitioner has proposed that comparisons of the base period years with earlier years shall be made on the basis of its reconstruction of *sales* of each product.

Petitioner has not presented data about the profits of other members of certain industries of which petitioner is a member.

Petitioner has the burden of proof throughout; it must first prove that it qualifies for relief under the subsections of section 722(b) involved. If it is held that it qualifies for relief, petitioner must

establish further what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income. *Winter Paper Stock Co.*, 14 T.C. 1312, 1317.

*Sections 722(b)(2) and (b)(3)(B)—Electric Conduit.*

*Section 722(b)(2).*—Petitioner contends that its electric conduit business was depressed in the base period years because of temporary economic circumstances *unusual with respect to itself*. (Petitioner does not claim that it qualifies for relief under the second clause of (b)(2) dealing with temporary economic events unusual in the case of an industry of which the taxpayer was a member.) The explanation of petitioner's reference to economic circumstances unusual in the case of itself is that petitioner claims that it is the sole member of its industry and there is no similarity between any other producer of fibre conduit and itself. In order that this contention may be clear, it seems best to state fully petitioner's view. Petitioner claims that it is the only member of an industry which produces conduit which is engaged solely in the production of fibre products, namely, fibre conduit, fibre duct, and fibre pipe. Illustrative of this observation of petitioner, it points out that the 2 other producers of fibre conduit, Brown Company and Line Material Company, produce other products than conduit made of other materials; Brown makes pulp and paper products, and Line is primarily a producer of electric pole line hardware. Petitioner points out, also, that Johns-Manville is primarily a producer of building materials. It is petitioner's theory, therefore, that there is no other producer of fibre conduit like itself.

Petitioner's contention is without merit because it makes other products in addition to conduit and its claim for relief under (b)(2) involves only its conduit business. If petitioner means that it, alone, represented a segment of the industry which makes fibre conduit and, thereby, seeks to avoid establishing what the industry is of which it is a member, petitioner's theory is of no avail. It is obliged to establish what the industry is of which it is a member because of its conduit business. Also, petitioner cannot by this means isolate its own conduit business from the general fibre conduit industry so as to avoid the fact that there was competition with other producers of conduit made of fibre and of other materials, or to avoid the point that certain alleged circumstances in the electric utility industry would have reacted in about the same way on all producers of conduit if, indeed, the alleged reactions had the claimed adverse effects. These points are discussed hereinafter.

The temporary economic circumstances which petitioner claims existed are said to have been brought about by the alleged *reactions* of about 90 percent of the investor-owned electric light and power

companies to the enactment in the early 1930's of certain Federal laws and the adoption of certain Federal policies and regulations dealing with both electric power holding companies and the initiation of publicly owned electric power and distribution projects. Petitioner contends that the alleged reactions to laws and administrative policies were expressed in alleged curtailments of capital expenditures by electric power companies during the years 1933 through 1939 because of their purported fears about the future of the electric power industry; and, also, that for the same reasons investors allegedly withheld investments in stocks of electric utilities and sharply reduced available sources of capital for capital expenditures of the utilities.

The laws which caused these alleged temporary reactions are: The Tennessee Valley Authority Act of May 18, 1933; the creation in 1935 of the Rural Electrification Administration, and its program; laws authorizing power projects similar to TVA, such as Bonneville Dam; the Public Utility Holding Company Act of 1935 (Wheeler-Rayburn Act) requiring segregation of large electric holding companies into smaller operating companies confined to a specific geographic area, and the registration of electric utility companies with the Securities and Exchange Commission, subjecting them to SEC jurisdiction with respect to the issuance, purchase, and sale of securities, intercompany loans, and other matters; the organization of rural electric cooperatives and Government loans to them; the Federal Government's encouragement of municipal power associations in various areas; and the acquisition in some areas of privately owned electric utility companies by rural cooperatives or State-owned public power districts. It is petitioner's position that such alleged reactions consisted of uncertainty and lack of confidence about the future of private ownership in the electric power industry and fears that public ownership and control thereof would expand and adversely affect the growth of investor-owned utility companies.

It is also argued by petitioner that because of increasing competition from REA cooperatives, private companies were forced to spend available funds for the construction of additional rural electrification, the less expensive overhead systems, rather than for the more expensive underground construction in which conduit is used, and as a result, capital expenditures for "transmission and substations" and distribution of electricity underground were depressed during the base period years, abnormally and temporarily.

Petitioner argues that these reactions to various laws were temporary and became less aggravated after 1938 and 1939. Petitioner refers to the Supreme Court decision in 1938 in *Electric Bond Co.* v. *Commission*, 303 U.S. 419, which settled a long controversy about the regulatory authority of SEC over electric utility companies, and to the

settlement of controversies in 1939 between TVA and several privately owned utility companies. Petitioner relies on *Dyer Engineers, Inc.*, 10 T.C. 1265, 1273, in which this Court recognized a distinction between changes in conditions brought about by legislation itself, and changes in conditions in an industry brought about by temporary reactions to legislation.

At the outset, it is noted that *Dyer Engineers, Inc., supra*, is distinguishable on its facts and is not helpful to the petitioner.

It is necessary to decide what is petitioner's industry for the purposes of its claim for section 722 relief, i.e., for the purposes of both (b) (2) and (b) (3) (B). Petitioner is obliged to prove what the industry is of which it was a member. *Green Lumber Co.*, 32 T.C. 1050, 1060; *Crane Co. of Minnesota*, 25 T.C. 727, 760; *Pabst Air Conditioning Corporation*, 14 T.C. 427, 438. Part I (F) of the Bulletin discusses the concept of industry (which the statute does not define), and the applicable regulations deal with the problem; Regs. 109, sec. 30.722–2(b) (8), and Regs. 112, sec. 35.722–2(b) (8) (p. 124). We need not set forth what it said about the concept "industry" in the regulations and Bulletin; in the *Pabst Air Conditioning* case (p. 438), we expressed the view that these concepts of the term "industry" are sound.

Petitioner did not attempt to deal with this matter by the introduction of proof, but the record shows that one of the component materials of which certain types of underground conduit are made is "fibre," that fibre may consist of woodpulp, paper pulp, and asbestos fibre and that the manufacturers who use a fibrous material in making conduit are petitioner, Brown, Line, and Johns-Manville. Thus, these four concerns comprise a group of enterprises engaged in producing and selling similar products under analogous conditions, "so as to be subject to roughly the same external economic circumstances affecting their prices, volume, and profits. Stated otherwise, an *industry will generally consist of all of the producers which compete with each other in selling essentially the same products or services in the same market*," Part I(F) of the Bulletin. (Italics ours.) At the least, these four concerns constituted an industry which in itself is a subdivision of the larger group of business concerns making all conduit for underground raceways out of various materials such as clay tile, cement, concrete, soapstone, pump log, and other materials. The record shows, for example, that precast concrete conduit competes with fibre conduit.

We must conclude that there is no merit to petitioner's contention that it is the sole member of an industry, i.e., that it is its own industry; the reasons given (that the other three companies produce more diversified products than does petitioner) do not have any economic substance or meaning here.

The respondent does not agree that petitioner's business was depressed in the base period. If, on the other hand, it were to be concluded that there was base period depression, he argues that it is by no means clear in this record that the alleged concern over certain legislation and policies in the 1930's, including all of the base period years, had any material adverse effect on the total amount of money which investor-owned electric utility companies actually spent for the improvement and expansion of all types of electric energy facilities during the base period, including distribution facilities and underground conduit raceways; and that it is clear that a loss of competitive position exercised an adverse influence upon petitioner's sales of underground conduit during the base period years.

The petitioner made no attempt to segregate from the total net profit of its overall business the net earnings and profits during each base period year realized from sales of conduit. For the purpose of (b)(2), petitioner refers only to the annual volume of sales of conduit expressed in feet and dollars. Of course, it is understood that the concept in (b)(2), business depression of the taxpayer, refers to depression represented by "low earnings or operating losses which resulted from such factors as low volume of output of products or services, from a low volume of sales, from high manufacturing costs, from low sales price, or from a combination of such factors." Regs. 112, sec. 35.722–3(b) (p. 128). Petitioner's failure to show what its annual net earnings were from the sales of conduit during the base period weakens petitioner's claim that its business was depressed.

Petitioner must show that its conduit business was depressed in the base period because of temporary economic circumstances unusual in its case. The alleged temporary economic circumstances *unusual in the case of itself*, are claimed to have been the following: The alleged curtailment of capital expenditures of electric utility companies, mentioned above, purportedly included curtailment of expenditures for distribution facilities, construction of underground cable raceways, and the purchase of conduit for raceways; the alleged reason for the alleged reduced expenditures was the electric utilities' temporary *reactions* to Federal laws and policies; the reactions caused expenditures for conduit to be subnormal beginning in 1933 and continuing through 1939; and, therefore, petitioner's conduit business was depressed in the base period. Petitioner contends, further, that after 1939 the alleged fears of the electric utilities ended because Government authorities cooperated more with the investor-owned utilities, so that their reactions and the alleged economic circumstances were temporary. Petitioner contends, next, that under normal conditions its annual sales of conduit would be 10,624,000 feet, its average annual volume during the 18-year period 1922 through 1939,

which volume is alleged to be the fair amount for constructive average base period sales of conduit.

Petitioner's evidence in support of the foregoing contentions is highly speculative and unconvincing. For example: Petitioner's proof of the alleged reactions of electric utilities to certain laws and policies consists of selected excerpts from issues of the Electric World, a trade journal published by McGraw-Hill, printed in the years 1933–1939, inclusive, consisting of editorial comments and articles; and opinion testimony to the same effect by the then associate editor, Archer E. Knowlton. Petitioner's proof about the alleged curtailment of purchases of conduit by electric utilities and the reasons therefor consists of schedules of figures printed in reports of the Edison Electric Institute showing the amounts of total capital expenditures of the electric utilities during the years 1922 through 1939, from which petitioner made computations of the average expenditures during the long period and the base period years, respectively. Petitioner's proof about the alleged investor reactions consists largely of statistical analyses of stock market sales of electric utility stocks, from which petitioner argues that during the base period the utilities had less new capital for constructing distribution and other facilities. Petitioner, then, made a series of seemingly logical deductions from such general data which represent its claim that it qualifies for relief under section 722 (b) (2).

Petitioner's presentation of data and all of its proof noticeably lacks specific factual information. Petitioner did not call any representative of any electric power company or of its customers to testify about their needs, purchases, and policies during the period 1933 through 1939, and prior to 1933 back to 1922, or about why they did or did not buy conduit at any time; or about anything else. Petitioner did not disclose who its conduit customers were, or what their purchases had been; and it did not introduce any evidence in explanation of, in specific terms, its large volume of annual sales of conduit during 1922 through 1931, and about the actual reasons for the decline in such sales beginning in 1932, and about the actual reasons for its level of sales during 1936–1939. Petitioner has done no more than present its theories.

The burden of proving the existence of the factors stated in (b) (2) ordinarily cannot be satisfactorily discharged by resorting to theories based upon inferences and deductions. We find petitioner's theories an unsatisfactory substitute for specific facts.

On the other hand, although respondent did not have a burden of proof, he presented a substantial quantity of proof of facts relating to installations of underground conduit systems during the years 1922 through 1931, and the conditions under which extensive con-

struction of underground systems were carried on; technological improvements; the market in which fibre conduit is sold; and changes in petitioner's competitive position in the material years.

Upon careful consideration of the entire record, it is concluded that petitioner failed to establish the existence of the qualifying facts and factors which are required under (b) (2).

During 1922 through 1931, petitioner's conduit sales were maintained at a higher level than during 1932 through 1939 and 1936 through 1939. During the earlier period sales averaged in excess of $1 million a year; during the base period the average was $533,286. Average profits for all of petitioner's business were also substantially lower in the base period. Petitioner's basic claim under (b) (2) is that the average amount of its conduit sales, in feet and dollars, during the 18-year period 1922–1939 should be treated as representative of the normal amount of its conduit sales. This is an assumption made by petitioner; it did not attempt to show on the basis of conditions, experience, and fact that this assumption properly can be made. It is evident that petitioner's claim that its business was temporarily depressed in the base period is founded upon the fact that its base period sales of conduit reached a substantially lower level compared to the level of its sales during the years 1922 through 1931 which was the period of the highest level of sales. The average amount of sales during 1932 through 1935 was $432,542, less than the base period average. Petitioner's average base period sales of conduit are low only when compared with the high level of sales during 1922 through 1931.

Fluctuations in sales, profits, and business in general are normal conditions. The mere failure to maintain a certain level of sales or earnings does not establish a depression of business or earnings within the meaning of section 722. In the Bulletin on Section 722 (p. 15), it is said that "A taxpayer is not entitled to relief merely because * * * its net income was smaller during the base period than in some earlier period, long or short." See *Toledo Stove & Range Co.*, 16 T.C. 1125; *Trunz, Inc.*, 15 T.C. 99, 103; *Harlan Bourbon & Wine Co.*, 14 T.C. 97, 104; *George Kemp Real Estate Co.*, 12 T.C. 943. In section 35.722–3(b), Regs. 112 (p. 129), it is said that "low volume of sales due to a low demand for such product or the taxpayer's output, or other ordinary economic hazards to which business in general is subject and which have the effect temporarily of depressing income *are ordinarily not sufficiently unusual economic circumstances* to constitute income an inadequate standard of normal earnings under section 722(b) (2)." (Italics ours.) We consider the above explanations in the Bulletin and regulations as sound and consistent with the statutory provisions.

It is well established that determination of whether a taxpayer's business, or earnings, is at a normal level during any particular period can be determined properly only by giving consideration to the nature and conditions of its business operations during such period. *Monarch Cap Screw & Manufacturing Co.*, 5 T.C. 1220. In *Norfolk & Chesapeake Coal Co.*, 18 T.C. 904, 913, this Court said: "Normal earnings refers to a measure established *over a reasonable length of time and under normal conditions* by the taxpayer, or by others under comparable conditions." (Italics ours.) Petitioner has not attempted to show or establish any period of normal business operations. All it has done is to take the position that the years 1936–1939 were not a normal period because of alleged unusual temporary circumstances. Upon making the assumption that such temporary and unusual circumstances existed in the base period and that because of them its business was depressed, petitioner then suggests that its normal conduit business is represented by the average volume of its conduit sales during the long period 1922–1939. Of course, the latter suggestion is made for the purpose of computing a constructive average base period net income, provided petitioner first proves that it qualifies for relief. Nevertheless, in order to qualify for relief under section 722(b)(2), petitioner must show that its business was *depressed* in the base period because of unusual and temporary circumstances; *Wadley Co.*, 17 T.C. 269, 279. The term, depressed, involves comparison with that which is standard and normal and signifies that which is substandard or subnormal. Petitioner may have intended to approach this matter by offering opinion evidence about its "break-even" point of operations, but this approach fell far short of a clear showing of what is normal in its operations. Moreover, there is much in the record indicating that petitioner's conduit business reached a level during 1922 through 1931 which was extraordinary and above normal and that after 1931, its normal conduit business necessarily was at a lower level of sales and earnings.

In the Bulletin (p. 15), it is noted that—

If the depressing influences were otherwise than temporary, the taxpayer or its industry could be characterized as a declining business or industry; a new lower level of normal earnings would then have been established by reason of these circumstances and the actual base period net income would not be an inadequate standard of normal earnings for comparison with earnings during an excess profits tax taxable year.

With respect to petitioner's theory about reactions to Federal laws relating to publicly owned electric power projects and the regulation of electric utility holding companies, our observations and conclusions about the record are as follows: Petitioner has failed to prove that the reason why its conduit sales were at the level which existed during 1936–1939 and why such sales were not larger than they were was due

to unwillingness of members of the electric utility industry to construct underground cable raceways, or was due to lack of funds with which to do so, because of fear reactions to the Federal laws and policies in question. No representative of any utility company so testified and there is no evidence to that effect in any respect. The reactions reported in the press were to the effect that members of the utility industry regarded the laws and regulations as indicative of the possibility of nationalization of the privately owned electric utilities; that their industry was unfairly treated; and there were suggestions to members "to stop, look, and listen" before spending money on new plants and improvements. But there is no proof that such alleged attitudes brought about a depression in either the conduit business in general, the fibre conduit branch, or petitioner's business. On the other hand, there is evidence that electric utilities in certain large cities purchased substantial amounts of conduit during the base period, such as Consolidated Edison; that technological improvements had had the effect of extending the period installed surplus conduit could provide for increased demand for electricity, lessening the need for new lines; and that expenditures for distribution facilities (where conduit is a relatively small expense item) were larger in the base period compared to the expenditures during 1932–1935. According to one series of statistics, average base period expenditures for the construction of distribution facilities by the entire industry was 121.07 percent of the average expenditures in the 18-years 1922–1939; according to another series, the average base period expenditures were 113.61 percent of the 18-year average expenditures. It is by no means clear that the alleged reactions to Federal laws had any substantially adverse effect on the amount of money which the electric utilities spent for the expansion, improvement, and maintenance of distribution facilities during the base period years. Petitioner argues that the high level of expenditures for distribution facilities during the base period were made, beginning in 1935, because the utilities devoted a larger portion of their distribution facilities expenditures to farm and rural electrification in competition with the Rural Electrification Administration. But petitioner did not succeed in showing thereby that expenditures for underground raceways were not also being made in a relatively substantial amount. The privately owned utilities extended electric service to the farm areas during the 1920's at a good rate and the increased expenditures for rural and farm electrification during the base period years do not signify a diversion of expenditures for distribution facilities away from the underground installations, which are customary in cities, or indicate that underground installations became depressed thereby. The utility companies customarily confine underground distribution facilities to large cities

and industrial centers, whereas rural and suburban electric distribution systems are overhead. It has not been shown that the utilities curtailed expenditures for underground installations in cities in order to increase overhead construction in areas outside cities.

The regulatory policies which grew out of the legislation referred to by petitioner, including TVA and the Public Utility Holding Company Act, have remained in operation. Administrative and judicial acts, passed upon legislation, are not economic events within the meaning of section 722(b)(2), *Norfolk & Chesapeake Coal Co., supra* at 914; and *Acme Breweries*, 14 T.C. 1034, even though they may have economic effects upon an industry or a business. This principle applies here insofar as the laws in question had an effect, if any, on petitioner's business. Petitioner contends that it comes within the rule expressed in *Dyer Engineers, Inc., supra*, but since petitioner has been unable to prove its theory that alleged reactions to certain Federal laws caused an alleged depression in its business in the base period, the *Dyer Engineers* case is inapposite.

Petitioner has failed to prove that unusual temporary economic circumstances existed which caused petitioner's conduit business to be depressed in the base period. It is concluded, also, that the alleged reactions of the electric utility industry to Federal laws and regulations did not cause a depression in petitioner's conduit business in the base period. Although it is not essential, we are constrained to summarize the reasons why petitioner has failed to prove that it qualifies for relief under (b)(2).

Taking the 18-year period 1922 through 1939, we find that the average sales of conduit during 1936–1939 were higher than the average sales during the 4-year period 1932 through 1935, which averaged only $432,540. The only earlier years with which the base period sales can be compared are, then, 1922 through 1931. There is persuasive and substantial evidence that there was unusually extensive construction of underground lines of conduit in the older heavily populated cities during 1922–1931 and that those years represented an era in which conduit installations were abnormally large. It is also evident that installed raceways for cable are a relatively static and fixed matter, whereas the technology involved in distributing electric energy is a dynamic matter because it is subject to developments, improvements, and changes in mechanical things. The impetus which brought about very large installations of conduit during 1922–1931 comprised several stimuli: (1) In the early 1920's, electric utilities experienced rapid growth following upon the end of the first World War. (2) Such growth and the congestion in larger metropolitan and industrial centers made it necessary to remove overhead wires and substitute underground cables, which was required by city

governments. (3) The electric utility companies, rather widely, changed the organization of distribution systems by installing large transformer stations from which electricity was transferred to substations, rather than being delivered directly from generating stations to substations, which required installing underground long interconnecting transmission lines (in banks of conduit) between the transformer stations and installing, also, new feed lines from the transformer stations to the substations. These 3 stimuli, social, governmental, and technological, happened to emerge at about the same time in the early 1920's. As far as the information here indicates, this coincidence of factors may not necessarily be repeated according to the same pattern. They created an unprecedented demand for underground conduit for use in the unprecedentedly extensive construction of underground systems of raceways for electric cable. There is testimony to the effect that in one area at least there has not been since then such large installations of underground raceways. Such installations were costly but it was not difficult to obtain capital. However, in view of such large expense, the utility companies planned ahead for expanding needs during the succeeding 10 or 20 years and, to that end, a substantial quantity of surplus ducts, having an almost unlimited period of usefulness, were installed. The quantum of the supply of installed surplus duct was transformed into greater utility by reason of improvements in cables. The improvements in cables had the effect of diminishing the size of the amount of surplus duct which reasonably would be needed to satisfy future needs, but the large surplus quantity of duct had been installed. That is to say, subsequent improvements in cables reduced the quantity of reasonably needed surplus duct so that the installed surplus became for practical uses a greater surplus in fact than had been planned. The result was that during the 1920's in many areas there were too many installed surplus duct.

This combination of circumstances must be understood and accepted as having the overall effect of making the years 1922 through 1931 a period of abnormal sales of conduit, generally, and for that reason in considering the provisions of section 722 it is not proper to regard the 1922–1931 years as a normal period of conduit sales of petitioner.

The record here shows, further, that because of what transpired in the aforesaid period, it was normal for the volume of conduit sales to go down after 1931. Petitioner's business and industry, therefore, appear to represent an example of a decline in business which is accompanied by the establishment of a lower level of business (sales) in which the causes for the diminishing volume are not temporary.

We are of the opinion, upon consideration of the entire record before us, that after 1931 a new lower level of sales (and earnings) was es-

tablished in petitioner's conduit business by reason of the described circumstances which were not temporary, and, therefore, petitioner's average base period income, as adjusted under section 713(f), is not an inadequate standard of normal earnings.

In addition, there is substantial evidence that petitioner lost business before and during the base period because of the competition of other producers of fibre conduit and of conduit made of other materials, which was not temporary, as is demonstrated by the change in 1938 of Public Service to Johns-Manville's asbestos-cement conduit, and the change of Consolidated Edison of New York in 1931 to precast square concrete conduit. A second reason for petitioner's lower level of base period conduit sales was the operation of competition. Competition is not a temporary and unusual economic circumstance within the meaning of (b)(2). *Harlan Bourbon & Wine Co., supra; Lamar Creamery Co.*, 8 T.C. 928, 939; *Emporium World Millinery Co.*, 32 T.C. 292, 300; *Interstate Milling Co.*, 32 T.C. 1038, 1047; *Yellow Cab Co.*, 35 T.C. 791, 800.

Petitioner makes an alternative claim under (b)(2); that its business was depressed because of a temporary unusual economic circumstance represented by loss of business during the base period because of the temporary decline in capital expenditures of the electric utilities, which caused petitioner to search for and develop new products for sale in new markets. Petitioner refers to an example in Regulations 112, sec. 35.722-3(b), p. 130 (second full paragraph), and cites *Southern California Edison Co.*, 19 T.C. 935, 979–984. For the reasons stated above, we conclude that petitioner's alternative claim has no merit. Also, *Southern California Edison* is distinguishable; there the taxpayer recouped lost business and the loss was temporary. *Interstate Milling Co., supra*, p. 1050.

It is held that petitioner does not qualify for relief under section 722(b)(2) with respect to its conduit business.

*Section 722(b)(3)(B).*—Petitioner contends in the alternative that it qualifies for relief under section 722(b)(3)(B). In its claim for relief under this subsection, petitioner refers to the necessity for long-range planning for future needs as a characteristic of the practices of the electric utility industry in their construction of underground systems for the distribution of electric energy. Thus, for this general reason and other practical reasons, the electric power companies followed the practice of installing more underground conduit at one time than were needed for use currently and in the immediate future, such reserves of conduit, called spare and supernumerary ducts, being left vacant until such time as it became necessary to draw electric cables into them. Petitioner claims that to the extent that electric utility companies normally built underground lines of conduit in ad-

vance of and for their future requirements, a sporadic and intermittent market and demand existed for its fibre conduit. For the purposes of (b) (3) (B), petitioner contends that such sporadic and intermittent demand for its fibre conduit was inadequately represented during the base period years because during the period 1936 through 1939 the capital expenditures of members of the electric utility industry for underground conduit were temporarily and abnormally depressed due to the temporary reactions of most of the members of that industry, and investors, to the Federal legislation and governmental policies already described. The long life of installed lines of conduit provides another reason for the alleged sporadic and intermittent demand for conduit. A further reason advanced with respect to this claim for relief is that during the base period construction of power lines by the electric utilities was diverted to constructing overhead lines in rural and farm areas.

Petitioner contends, also, that such characteristic of the consuming industry's demand for conduit affected the businesses of all members of the industry producing conduit for underground installation.

In order to qualify for relief under (b) (3) (B) petitioner must show, *inter alia*, "that the other members of its industry were also depressed because of such conditions and that the base period was not representative of the normal earnings of the industry due to the failure to reflect years of high production and profits characteristic of the industry. Regulations 112, section 35.722–3 (c), p. 132." *Roy Campbell, Wise & Wright, Inc.*, 15 T.C. 894, 899. Section 35.722–3 (c), Regs. 112 (p. 132), reads:

The *ordinary circumstances* existing *in the case of the industry* of which the taxpayer is a member and which produce business depression *in the case of the taxpayer* must also be established by the taxpayer to have produced *business depression with respect to the industry generally* during the base period. [Italics ours.]

The provisions of (b) (3) (B) are applicable only in the case of "sporadic and intermittent periods of high production *and* profits." (Italic ours.) There is no basis whatsoever for ignoring the "high profits" requirement. *Wadley Co., supra*, 285. Section 35.722–3 (c) (2), Regs. 112 (pp. 134–135), states in part as follows:

In case the taxpayer is subjected to intermittent periods of high production and profits, the prosperous years of the taxpayer will occur at irregular and unpredictable intervals, and may depend upon fortuitous combinations of advantageous circumstances, as for example the juxtaposition of a good crop and a good market. [This is illustrated by reference to an industry engaged in the preparation and canning of fruit.] If the base period of the taxpayer does not include these prosperous years, its earnings during such period will not be an adequate measurement of normal earnings.

Proof that a year of high production and profits did not occur during the base period is not of itself sufficient to establish that the base period did not represent a period of normal earnings. * * *

A taxpayer which claims to be a member of an industry in which conditions prevail which subject the taxpayer to sporadic and intermittent profits must establish that business depression was encountered during the base period because of such conditions. It must also establish that such conditions were not peculiar to it alone in the base period but were also present in the case of such industry.

The evidence to be considered under this issue is the same, in general, as has been considered in connection with the claim for relief under (b) (2), and upon the entire record we must conclude that petitioner has failed to establish the existence of the facts set forth in (b) (3) (B), namely: The evidence does not show that the conduit business of petitioner was depressed in the base period, or that other members of the fibre conduit segment of the conduit industry, Brown, Line, and Johns-Manville, were depressed in their respective conduit businesses. For the same reasons stated in considering the (b) (2) question, we must reject as unsound petitioner's theory about the alleged effect of adverse reactions in the electric utility industry to certain Federal laws resulting in curtailment of purchases of conduit in the base period years.

The evidence shows that members of the electric utility industry regularly purchase electric conduit each year. If their individual purchases did not reach the same or a certain level each year, it does not follow therefrom that their purchases were made in such way as to subject the taxpayer to "sporadic and intermittent periods of high production and profits." Petitioner has failed to prove that there were conditions generally prevailing in its industry which subjected it to sporadic and intermittent periods of high production and profits and that such periods were inadequately represented in the base period.

*Section 722 (b) (3) (A)—Variant Profits Cycle.*

Petitioner's claim for relief under (b) (3) (A) relates to the segment of its business which is devoted to the making and selling of underfloor fibre electric duct systems, referred to hereinafter as duct systems. The elements in (b) (3) (A) with which petitioner's evidence necessarily must be concerned are the following: *The taxpayer's business must be depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to a profits cycle differing materially in length and amplitude from the general business cycle.* The burden is on the petitioner under this subsection to prove at the outset that its business was depressed during the base period because of the factor cited. *Austin Co.,* 22 T.C. 703, 711. The significance of the elements in the statutory provision has been discussed in the following cases: *El Campo Rice Milling Co.,* 13 T.C. 775, 786, 788; *Pabst Air Condition-*

*ing Corporation, supra; Foskett & Bishop Co.*, 16 T.C. 446, 465; *Avey Drilling Machine Co.*, 16 T.C. 1281, 1295–1296; *Crane Co. of Minnesota, supra* at 760–761, 764–766; *Bigelow-Sanford Carpet Co.*, 34 T.C. 251, 271.

Petitioner's industry, for the purpose of this issue, is the underfloor duct system industry. As far as the record shows, there were three members of the industry during the base period years 1936–1939, the petitioner, and two concerns designated for the present purposes as X Company and Y Company. The three companies, during all of the base period and as far back as July 30, 1932, were parties to a license agreement under which petitioner and Y Company were required to pay royalties to X Company. Within and subject to the scope of this agreement, the three corporations were competitors.

Petitioner contends that the "condition generally prevailing" in the above-described underfloor duct industry which subjected our taxpayer-petitioner to a variant profits cycle was the influence of construction of certain classes of nonresidential buildings in which underfloor duct systems could and might be used.

Petitioner contends that the general class of nonresidential construction which it claims is relevant was depressed during the base period years. Petitioner, in support of this view, relies on a series of statistics compiled by the United States Department of Commerce showing the total dollar expenditures during the period 1920–1949, inclusive, for the construction of the general classes of buildings described as warehouses, offices, loft buildings, and public administration buildings. These statistics show that the total dollar expenditures for such construction during 1936–1939 was 75.4 percent of the average expenditures during the 18-year period 1922–1939, and petitioner concludes therefrom that such construction was depressed. Petitioner claims that the trend of *sales* of itself and the other members of its industry normally follow the trend of the particular types of construction (the trend here being shown by dollar expenditures for such construction), and that since the consumer market for underfloor duct was depressed in the base period it follows that petitioner's underfloor duct system business was also depressed in the base period.

The 17-year average of petitioner's actual dollar sales of duct systems during the years 1923 through 1939 was $187,175; the average of its actual dollar sales in the 4 years 1936–1939 was $150,922. Petitioner contends that these average amounts of sales show that its business was depressed.

Petitioner was unable to show the profits of itself and the X and Y companies in the base period from the manufacture and sale of duct systems. As stated previously, petitioner's accounting records did not show separately the annual profits of each segment of

its business. Petitioner made no effort to show what portion of the total profit of its overall business for any year can be allocated properly to its sales of the product under discussion.

The only evidence presented by petitioner about its competitors is the dollar amounts of their respective sales; the volume of each one's annual sales, such as by feet, is not shown; only the volume of petitioner's sales (feet) is shown.

In the absence of evidence about its actual net earnings each year from sales of duct, petitioner made the assumption that since all of its products, conduit, duct, and pipe, are made of the same basic material under the same processes, its profits from the sales of duct follow the trend of its sales. We need not state here petitioner's analysis of the point of increasing and of diminishing returns and of its break-even point in its overall business operations. Petitioner resorted to and attempted to apply certain general principles of traditional economic theory as a means of indicating its profits trend and break-even point during the 1920's and other periods. Consideration has been given to the analysis, or method, but we find it an unsatisfactory and unacceptable substitute for data about petitioner's profits from the sales of duct.

It must be concluded that the petitioner has failed to produce any specific and reliable data showing, with respect to sales of duct, its profits during the extended period and the base period; consequently, a reasonably true comparison of petitioner's profits in the base period with its profits in prior years cannot be made, and upon this record a finding cannot be made that petitioner's business was depressed in the base period.

A mere showing that base period average sales of duct systems was lower than average sales for an earlier period does not alone establish a depression in this segment of petitioner's business in the base period. The respondent suggests that there are rather definite indications that other factors of a noncyclical nature may well have exerted an adverse influence on petitioner's duct system business during the base period, such as the entry into the market of the Robertson cellular steel floors which eliminated the use of a separate underfloor duct system, a less favorable competitive position after the Y and X corporations produced competitive underfloor duct systems, changing sales and royalty costs, and a less advantageous patent position in the 1930's than in the 1920's. Cf. *Bigelow-Sanford Carpet Co.*, *supra*.

Moreover, lacking specific data about how the profits from duct sales of Y during the base period compared with its profits in prior years, and about the profits of X during the years 1935–1939, makes it impossible to determine whether petitioner's profits followed the same trend as the profits of other members of its industry and whether under such comparison petitioner's duct system business suffered base

period depression. In a parallel situation, however involving a different issue, we said that "to compare an unknown to an unknown and find that one is abnormal to the other * * * cannot be done." *Crestwood Publishing Co.*, 29 T.C. 789, 796. See also *Metal Hose & Tubing Co.*, 21 T.C. 365, 370.

Even if certain assumptions were to be made, namely, that the existing relationship between petitioner's sales during the base period and during the 17-year period ending with 1939 indicates that petitioner's *profits* on such sales were at a lower level in the base period, we would not be able to conclude that such lower level of base period profits was caused by any conditions generally prevailing in petitioner's industry, subjecting petitioner to a profits cycle differing materially in length and amplitude from the general business cycle. "It is essential to the establishment of a right to relief under this provision that the taxpayer's profits cycle differ *materially* in length and amplitude from the general business cycle." *Avey Drilling Machine Co., supra.* To determine the cyclical pattern of petitioner's industry certain long-range statistics were submitted by petitioner dealing with the value of nonresidential construction, i.e., of office, loft, warehouse, and public administration buildings construction. The nature of this statistical data is described in our findings. Petitioner attempted to prove the interrelationship between its industry and the selected nonresidential construction industry through a series of correlations. In *Bigelow-Sanford Carpet Co., supra* at 273, we observed, "But correlation computations have no particular evidentiary value unless it is previously shown that there is some important relationship between the respective activities which are compared." The statistics presented by petitioner are of little value for the present purpose because they cover too broad a field.

The record contains comparisons of other series of figures, namely: Petitioner's net sales are compared with total compiled receipts, or sales, of all United States corporations; comparison was made of total compiled receipts of all corporations and total compiled net profits of all corporations with total construction expenditures for selected nonresidential buildings—office, loft, warehouse, and so forth. These comparisons do not provide any basis for concluding that petitioner's duct systems business was subject to a variant profits cycle. It is concluded, therefore, that petitioner has failed to satisfy the requirements of section 722(b)(3)(A).

*Section 722(b)(4)—Change in the Character of Business.*

Petitioner's contention that it changed the character of its business rests upon the claim that (1) there was a change in its management, (2) that there were changes in production operations which resulted

in substantial cost savings and increased capacity for production, and (3) that it introduced new products into new markets.

Respondent contends that the record does not establish that petitioner's first two claims represent "changes" which satisfy the statute. With respect to the third factor, the respondent does not strongly oppose the contention that petitioner introduced some new products in view of the fact that their end-use was different than the use of the products sold as conduit and duct. He insists, however, that the introduction of some new products is not enough and points out that the petitioner must also establish that "the average base period net income does not reflect the normal operation for the entire base period of the business." It is his view that petitioner is unable to meet the latter requirement and, therefore, has not established a right to relief under (b) (4).

Petitioner's statutory average base period net income as determined under the growth formula provisions of section 713(f) is equivalent to its actual excess profits net income for the year 1939 in the case of each of the excess profits tax taxable years involved, as well as in the case of subsequent years which also have to be considered in connection with any reconstruction question involved herein. The question of whether petitioner's statutory average base period net income constitutes an inadequate standard of normal earnings because of its introduction of new products during the base period is accordingly dependent upon the question of whether or not petitioner would have achieved any substantially greater volume of sales which would be reflected in increased earnings for these new products than the volume which was achieved during the year 1939 if such products had been introduced 2 years prior to the actual event. Petitioner is required to prove that it is entitled to have the 2-year push-back rule applied in the determination of a constructive average base period net income, and this proof is essential to the establishment of its new product claims. *Central Bag Co.*, 27 T.C. 230.

With respect to the first two contentions of the petitioner, the following is pertinent: The petitioner has failed to show that there was actually new management of the petitioner during the base period or immediately prior thereto. The deaths of certain officers and directors brought about more or less automatic succession by others who had held positions of responsibility and had participated in the direction of petitioner's business. Changes in personnel are insufficient alone as a qualification for relief. *Robertson Factories, Inc.*, 31 T.C. 1106. That is particularly true with respect to the new president, Robertson. The record indicates that the policies pursued after he became president in 1936 did not differ substantially from petitioner's earlier policies except with respect to the efforts of the new president

to introduce new products and find new markets for products. Robertson had contributed a great deal toward the development of new policies several years before 1936 and not immediately prior to the base period. The inauguration of certain research activities in the early 1930's laid the foundation for several policies which were continued after Robertson became president. To come within the statute, the changes "must be a substantial departure from the preexisting nature of the business." *Avey Drilling Machine Co., supra.* This cannot be said here.

The change to the vacuum treating process brought about substantial improvements in petitioner's operations. Petitioner continues to insist that the vacuum process was adopted immediately prior to the base period but it wholly failed to prove this contention. The record clearly shows that the research and experiments which lead to the development of the vacuum process were carried on for a period prior to 1933, so that in 1933 the petitioner was ready to and did use the vacuum process in a substantial amount of its manufacturing operations. Thereafter, all of the treating process was done according to the vacuum system and the tank process was eliminated. For the purpose of (b) (4), it cannot be concluded that the vacuum system was put into operation immediately before the base period, as is required.

The evidence is vague and unsatisfactory about the alleged changes which brought about savings in costs and increases in capacity. Improvements in operations and developments which are brought about to satisfy the requirements and demands of customers do not represent the kind of "change in the character of business" which (b) (4) contemplates. *Avey Drilling Machine Co., supra* at 1298; *West Flagler Amusement Co.*, 21 T.C. 502, 506–508.

With respect to the claim that new products were introduced, it cannot be said that Nocrete was a new product. Nocrete is only a trade name. The product differs from that which petitioner had sold for many years as its standard conduit only by reason of having a somewhat thicker wall. It is a tubular product which is made for use in the construction of underground raceways for electric cables, without the protective concrete encasement which is necessary in the installation of the standard conduit. The adoption of the vacuum treating process in 1933 appears to have helped in the development of a heavier wall product which could be installed without a concrete envelope. It is evident that this product represented essentially an improvement in one of the older chief products; its market is obviously the same as the market for the standard conduit. In *Air Preheater Corporation*, 36 T.C. 982, we noted that there is ordinarily difficulty in proving a change in product as distinguished from an

improvement. In each case, the question must be determined from the particular facts; here, petitioner has not convincingly established that the heavy-wall tube called Nocrete was a new product.

In the case of the pipe sold to drain water from oil fields (later called Alkacid) and the perforated drainpipe sold for use in sanitary drainage, the facts show that new products were created and new markets were accordingly developed. *Bardons & Oliver, Inc.*, 25 T.C. 504. "A product * * * is different * * * if the trade custom or practice treats it as a product of a different class." See Regs. 112, sec. 35.722–3(d)(2) (p. 143).

The next question is whether petitioner has shown that increased earnings resulted from the difference in products.

In order for a taxpayer to be entitled to relief because of a difference in the products or services furnished, it must show that such change is substantial as measured by two basic tests:

(i) The nature of the operations must be essentially different after the change from the nature of the operations prior to the change; and

(ii) There must be a higher level of earnings which is directly attributable to the change.

Bulletin on Section 722, pt. V(C)(2), p. 50. In *Toledo Stove & Range Co.*, *supra* at 1133, this Court held that where a taxpayer fails to show that a higher level of earnings resulted from an alleged change in the character of business, he is not entitled to relief.

Petitioner's experience with draintile, Alkacid, and Nocrete was essentially parallel throughout the years 1938 and 1939. The monthly sales statistics for these years provide a strong indication that petitioner was achieving no greater acceptance of any of these products in 1939 than it had achieved in 1938; a comparison of annual sales in 1938 and 1939 indicates the same conclusion. It is noted, in this same connection, that the Johns-Manville product, Transite Conduit, was in direct competition with petitioner's Nocrete and showed an increase in both footage and dollar sales of approximately 45 percent from 1938 to 1939.

The combined total constructive sales which petitioner is claiming under the 2-year push-back rule for all new products is comprised largely of Alkacid sewer pipe and perforated drainpipe. The petitioner relies upon the opinion of its president that there would have been substantially higher sales of the new products if petitioner had started its production 2 years earlier than actually occurred. Robertson's opinion was not based on facts and was an estimate which is not in line with petitioner's actual experience. We said in *Industrial Supplies, Inc.*, 18 T.C. 1067, 1075, that more than the mere conclusion of the witness is necessary to establish the required ultimate fact. See also *Smith's Heating, Inc.*, 24 T.C. 533, 548–549. Robertson's testimony with respect to the level of sales which petitioner would have

been able to achieve if it had commenced the sale of drainpipe, Alkacid, and Nocrete 2 years earlier shows that he had extreme difficulty in understanding just what factors he was entitled to take into account in forming an opinion on this subject. It is not at all clear from a consideration of all his testimony on this subject that he was not expressing an opinion as to the level of sales which petitioner would have achieved by the end of 1941.

He acknowledged that he did not take petitioner's annual sales for the years 1938 and 1939 into account in arriving at the opinion which he expressed, to the effect that petitioner would have achieved an annual sales level of from $900,000 to $1 million on a combined basis for Alkacid and drainpipe if it had commenced selling those products 2 years earlier. Another of petitioner's witnesses later translated Robertson's opinion into the separate constructive 1939 sales figures of $452,000 for Alkacid, and $449,000 for perforated drainpipe which he used in the proposed method of reconstruction. It appears that Robertson's confusion on this matter and his high estimates reflected consideration of post-1939 events, which, of course, is not allowed.

Upon consideration of all of the evidence bearing upon this matter, it is concluded that there is no convincing evidence to indicate that the petitioner did not reach by the end of the base period the earning level which it would have reached if it had made all of the changes relied upon to support its claim for a change in character, 2 years earlier than such changes were actually made. Petitioner's proof is insufficient to justify an application of the 2-year push-back rule. *Industrial Supplies, Inc., supra.* It is held that the difference in products in the base period is not such change as would entitle petitioner to relief under (b) (4), and that petitioner has failed to establish that the difference in products sold in the base period resulted in a higher level of normal earnings which were inadequately reflected in its average base period net income computed under section 713(f).

*Section 722(b) (5)—Other Factors.*

Petitioner also claims relief under section 722(b) (5). However, it relies basically on the same facts which we found insufficient as a basis for granting relief pursuant to section 722(b) (2). Petitioner has not introduced "any other factor affecting" its business as required by subsection (b) (5). Its claim is, therefore, without merit.

*Section 722(a)—Constructive Average Base Period Net Income.*

In view of the conclusions that petitioner is not entitled to relief under any of the subsections of 722(b) upon which it relies, we do not reach the question of whether it has established a fair and just amount

representing its normal base period earnings, for use as a constructive average base period net income, or whether such amount would result in a higher excess profits credit for any of the taxable years involved than the excess profits credit computed heretofore with the benefit of the growth formula provisions of section 713(f).

Reviewed by the Special Division.

*Decision will be entered for the respondent.*